**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                        :
THE SATANIC TEMPLE, INC.,               :
                                        :      CIVIL ACTION NO. 5:23-cv-01244
            Plaintiffs,                 :
                                        :
    v.                                  :
                                        :
SAUCON VALLEY SCHOOL DISTRICT,          :
                                        :
            Defendant.                  :
_____:

---

**BRIEF IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

---

**FOX ROTHSCHILD LLP**
Mark W. Fitzgerald, Esquire
W. Christian Moffitt, Esquire
Beth N. Shore, Esquire
980 Jolly Road
Suite 110
Blue Bell, PA 19422-3001
Telephone:  (610) 397-6500
Fax:  (610) 397-0450
mfitzgerald@foxrothschild.com
cmoffitt@foxrothschild.com
bshore@foxrothschild.com
*Attorneys for Defendant,
Saucon Valley School District*

144546806.3

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................. 3

        A.      The District and its Facility Use Policy ...................................... 3

        B.      The TST's Facility Use Application and Violation of Policy 707............. 5

        C.      Revisions to the District's Facility Use Policy ........................................ 9

III.    ARGUMENT ................................................................................................... 10

        A.      TST Is Unlikely to Succeed on the Merits Because the District's Has
                Not Foreclosed TST From Renting Space in the District Nor Has It
                Discriminated Against TST on the Basis of Viewpoint or Content. ........ 11

        B.      The District's Past Decision to Rescind TST's Facility Use
                Application Was Based on TST's Violation of Policy 707, Not
                Viewpoint Discrimination........................................................................ 15

        C.      The Other Factors Necessary For the Issuance of a TRO or
                Preliminary Injunction Weigh Against TST. ........................................... 20

IV.     CONCLUSION ................................................................................................ 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acierno v. New Castle Cnty.*,
  40 F.3d 645 (3d Cir. 1994)................................................................................10

*Board of Regents of Univ. of Wis. System v. Southworth*,
  529 U.S. 217 (2000)........................................................................................18

*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F.2d 86 (3d Cir. 1992)...............................................................................11

*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*,
  473 U.S. 788 (1985).....................................................................................12, 14

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
  765 F.3d 205 (3d Cir. 2014).............................................................................10

*Flynn-Scarcella v. Pocono Mountain Sch. Dist.*,
  745 A.2d 117 (Pa. Commw. Ct. 2000) ..............................................................21

*Gerardi v. Pelullo*,
  16 F.3d 1363 (3d Cir. 1994).............................................................................10

*Good News Club v. Milford Central School*,
  533 U.S. 98 (2001)..........................................................................................12

*in Terminiello v. City of Chicago*,
  337 U.S. 1 (1949).............................................................................................1

*Johanns v. Livestock Marketing Assn.*,
  544 U.S. 550 (2005) ........................................................................................18

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004).............................................................................10

*Madison Square Garden Corp. v. Braddock*,
  90 F.2d 924 (3d Cir. 1937)...............................................................................11

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997).....................................................................................11, 20

*Opticians Ass'n of Am. v. Independent Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990).............................................................................10

144546806.3

*Parkell v. Senato*,
    639 F. App'x 115 (3d Cir. 2016) ..........................................................................10

*Perry Education Association v. Perry Local Educators' Association*,
    460 U.S. 37 (1983) ................................................................................13, 14

*Pleasant Grove City, Utah v. Summum*,
    555 U.S. 460 (2009) ............................................................................18

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ..........................................................................12, 18

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ............................................................................18

*Thakker v. Doll*,
    451 F. Supp. 3d 358 (M.D. Pa. 2020) ..................................................10

*Unionville-Chadds Ford Sch. Dist. v. Rotteveel*,
    487 A.2d 109 (Pa. Commw. Ct. 1985) ................................................21

*William Penn Sch. Dist. v. Pennsylvania Department of Education*,
    2023 WL 1990723 (Pa. Commw. Ct., Feb. 7, 2023) ............................21

**Statutes**

24 P.S. § 5–510 ........................................................................................20

I.       **INTRODUCTION**

The First Amendment's protections are not absolute. Embracing the value of the First Amendment, but also recognizing the government's reasonable regulation of it, Justice Robert H. Jackson emphasized nearly 74 years ago in his dissent *in Terminiello v. City of Chicago*, 337 U.S. 1, 911 (1949), "The choice is not between order and liberty. It is between liberty with order and anarchy without either." From the Saucon Valley School District's ("the District") initial interactions with the Satanic Temple ("TST") through the present, the District has chosen liberty with order.

The District's decision to initially approve TST's application to rent space in the District's Middle School for TST's After School Satan Club ("the Club") was consistent with the District's School Board policy governing the use of school facilities, as well as the law. So too was the District's decision to rescind that approval eight days later, following its discovery that TST had violated the District's Board Policy's advertising restriction on social media, a choice by TST that had a cataclysmic effect on the District's operations. The District approved TST's application on February 16, 2023. Subsequent to that approval, but unknown to the District, TST engaged in a provocative social media campaign misleading District parents and community members, and even strangers across the country, that the District was sponsoring the Club. This was an intentional violation of the District's Facility Use Policy, which states that "When advertising or promoting activities held at school facilities, individuals and community groups shall clearly communicate that the activities are not being sponsored by the school district." (Policy 707, ECF No. 1-4). TST's actions misled community members and people across the country to think that the Club was being sponsored by the District, not just letting the Club meet in its building. As a result, the District received an avalanche of emails and phone calls from parents and community members, confused and concerned that the District was sponsoring a club "for Satan." Even so, the District, unaware

of TST's social media campaign and recognizing the Club's First Amendment right to convene in District facilities like other groups do, continued making preparations for the Club's use of its facilities.

That all had to come to a halt once the District received a voicemail from an anonymous person threatening to shoot up the school because of the District's kids that "have fun at the school Satan club." In response, the District, its private security force, the local police department, and the FBI jumped into action to ensure the safety of the District's students and staff. That necessitated the closure of the District's schools for an entire day while the threat could be investigated. Still, despite shouldering the enormous responsibility to protect students and staff, the District continued communicating with TST to make arrangements for the Club's meeting. Meanwhile, TST continued to post on social media, advertising that the District was "hosting" the Club. Only after the District was closed and the threat was being investigated, did the District first become aware of TST's social media campaign that violated the District's Facility Use Policy, a violation that ultimately resulted in a substantial interference with the District's educational program. At that point, the District was left with no choice. To ensure that its educational program would not be compromised further by threats to the lives of its students and staff, the District rescinded TST's facility use approval, as it was entitled to do under its Facility Use Policy.

This incident brought to the forefront longstanding security concerns the District has had with its Facility Use Policy, which has it made urgent for the District to review and revise this policy, a process that began before TST filed this action and continues as of this filing. And owing to these security concerns, the District is not willing to reconsider TST's facilities use application during this review period under the soon-to-be defunct policy. Once the revised policy is approved, which the District expects to happen imminently, all outside groups, including TST, will be able

144546806.3

to rent space from the District subject to the revised time, place, and manner restrictions, which the District believes are needed to ensure the safety of students and staff—something which this incident has made necessary lest the use of the District's facilities by outside groups again interfere the District's educational mission. The District's restriction of TST's use of its facilities was, thus, reasonable under its old policy. And because TST will be able to apply to use District facilities under the new policy, like other groups would similarly be able to do, TST's motion for a preliminary injunction should be denied.

## II.    FACTUAL BACKGROUND

### A.    The District and its Facility Use Policy

The District is a public school district of 1,998 students, located in Northampton County, Pennsylvania. *See* Affidavit of Jaime Vlsaty ("Vlasaty Affidavit") attached hereto as Exhibit "A" at ¶3. Like many other public school districts in Pennsylvania, the District makes its facilities available for outside organizations and individuals to rent outside of school hours. Given that a public school's primary function, though, is to educate and ensure the well-being of its students, not to serve as an event venue, the District maintains rules governing the use of its facilities. The majority of these rules are encompassed in the District's Board Policy 707 ("Policy 707"), entitled "Use of School Facilities," a policy approved by the District's Board of School Directors ("Board"). The fundamental purpose of Policy 707 is to make school facilities "available for community purposes, provided that such use does not interfere with the educational program of the [District's] schools." (Board Policy 707, ECF No. 1-4 at p. 1). To that end, it is the policy of the Board "to make available the facilities of the school district to organizations, associations and individuals of the community for civic, cultural, educational and recreational activities when the scheduling of these activities does not interfere with the educational program of the district." *Id.*

144546806.3

In furtherance of this overarching purpose, Policy 707 establishes the procedures individuals and community groups must follow to obtain approval to use District facilities as well as the rules they must abide to once that approval is granted. Pursuant to Policy 707, the Administration (i.e., the District Superintendent and her staff) "is charged with the responsibility of reviewing each request for use of facilities and, if all requirements are met, scheduling the use of facilities." *Id.* Once the Administration has approved an applicant's facility use application, the applicant must also comply with the limitations in Policy 707, including the advertising restriction, which states, "[w]hen advertising or promoting activities held at school facilities, individuals and community groups shall clearly communicate that the activities are not being sponsored by the school district." (Policy 707, ECF No. 1-4 at p. 3).

The purpose of this advertising restriction is to ensure that there is no confusion among District students, parents, community members, and others about activities and programs that are being sponsored by the District and those which are not. Put differently, there is a distinction between activities and programs sponsored by the District and activities and programs that are not sponsored by the District, but are simply held on District property. The former is not governed by Policy 707. The latter is. This distinction is significant because in opening up District facilities for civic, cultural, educational, and recreational purposes by outside individuals and organizations, the District is not endorsing the expression of every individual or organization that rents space in its facilities; rather, the District is simply making its facilities available for these limited community purposes. In contrast, programs that bear the imprimatur of the District are those which the District's Administration has vetted and determined enhance the District's overall educational program, warranting the District's sponsorship and support.

4

A violation of Policy 707's advertisement restriction could result in the District rescinding the individual or organization's approval to rent District facilities. According to Policy 707, "[t]he school district reserves the right to remove from school district premises any individual or community group who fails to comply with the terms and conditions of this policy and established procedures." *Id.* at p. 4. The policy further provides, "[i]n the event an individual or community group violates this policy or the terms under which permission was granted to use school facilities, that individual or community group forfeits the right to submit future written requests to use school district property, unless otherwise directed by the Board." *Id.*

**B.      The TST's Facility Use Application and Violation of Policy 707**

TST submitted its application to rent District facilities for the Club on February 1, 2023, in an email communication from June Everett, Campaign Director for the Club, and an Ordained Minister of TST. (Vlasaty Affidavit, Exhibit "A" at ¶¶4-5). After determining that TST's application had met the standards in Policy 707, Superintendent Vlasaty approved TST's application on February 16, 2023, and District staff notified TST accordingly. *Id.* at ¶¶13-14. A mere three days later, President's Day, a day when the District was closed, the Superintendent began receiving phone calls and emails from District parents and community members expressing concern about the District's sponsorship of the TST's Club. *Id.* at ¶19. In response to these concerns, at 7:52 P.M. that night, Superintendent Vlasaty issued a letter via email to the entire District community explaining that the District had approved the Club to use school facilities after school hours, but that Club was not a District approved club. *Id.* at ¶20. Around the same time, District administrative staff, including the Superintendent, continued communicating with Ms. Everett about logistical details regarding the Club's use of District facilities. *Id.* at ¶21.

The following evening, at approximately 5:00 p.m., an anonymous individual left a threatening voicemail at the District's Middle School's main telephone number, about "kids that

have fun at the School Satan Club" saying he was going to "come and fucking shoot everybody." (Vlasaty Affidavit, Exhibit "A" at ¶22). The Middle School secretary, who was already home at that late hour, happened to receive the voicemail through her email, and immediately contacted Superintendent Vlasaty, who, fortunately, was still on-campus. *Id.* at ¶¶23-24. Superintendent Vlasaty and Business Manager David Bonenberger, who also was still on-campus at that time, immediately contacted the Lower Saucon Police Department and within approximately six minutes made arrangements to clear the District campus of all students and staff, who were there for various District-sponsored extracurricular activities. *Id.* at ¶¶25-27. It was chaotic, and students, parents, and staff were understandably, frightened. *Id.* at ¶¶28-30. Custodians barricaded themselves in various spaces in the buildings, and Parents rushed to the District to pick up their children. *Id.*

Once the campus was clear, in consultation with the Lower Saucon Police Department and the District's private security firm, Superintendent Vlasaty ultimately decided to close all District schools for the following day because at that time, the threat was from an unknown source, and the authorities needed time to investigate it to ensure the safety of District students and staff. *Id.* at ¶¶31; 34. The decision to close schools was not an easy one because the District has always striven to remain open for its students. The District, which did not even close during the height of the COVID-19 pandemic, has never in recent memory been closed as a result of a security threat like the one that occurred on February 21, 2023. (Vlasaty Affidavit, Exhibit "A" at ¶¶32-33).

The Saucon Valley Township Police Department worked in conjunction with other agencies, including the FBI, throughout the day on February 22, 2023, and was able to track the caller's cell phone, which gave Superintendent Vlasaty some comfort in re-opening the District on February 23, 2023, even though the suspect had not yet been arrested. *Id.* at ¶¶36. The District increased security on its campus on Thursday, February 23 and Friday, February 24, hiring

6

additional personnel and extending the hours for our security coverage, costing the District an additional $6,352.50 in security fees for those two days. *Id.* at ¶37. All the while, although the District was open, the District Administration continued to receive a number of phone calls and emails from frightened teachers and parents, some of whom chose to keep their children home from school for the remainder of the week because they and/or their children were scared for the children to return to school due to the shooting threat. *Id.* at ¶38. Over the course of that 5 day-period, the District's Administration received over 40 phone calls and 50 emails or handwritten letters, daily, from concerned staff, parents, and community members. *Id.* at ¶39.

Although the District's Administration took each and every one of these communications seriously, recognizing TST's right to rent District facilities for its Club—like the Saucon Community Church does for the Good News Club ("GNC")—District staff continued to coordinate plans with the TST for its use of the District's Middle School for TST's Club. *Id.* at ¶¶40-41. That only changed once the District learned that TST had intentionally violated the advertising restriction in Policy 707, which, from the District's perspective, added to—if not outright caused—the chaos in the District and the interference with its educational programming. Between February 22-24, 2023, Superintendent Vlasaty was made aware by various community members of posts on social media about the Club.

The first social media post that came to her attention was posted to the Hellertown, PA Facebook page by a person named Nikki Romy on Monday, February 20, 2023, the day the District began receiving emails and phone calls about the Club. (Vlasaty Affidavit, Exhibit "A" at ¶43). The post was directed to "Saucon parents" (i.e., District parents) and stated that Pennsylvania's very first After School Satan Club was "launching at Saucon" and that participants did not "have to be students of Saucon Elementary." *Id.* at ¶47. The post also included a flyer for the Club that

identified "Saucon Valley Middle School" in large font in the center of the flyer, again indicating the Club was being sponsored by the District. *Id.* The very bottom of the flyer included language in very small font that was virtually illegible on a computer screen, tablet screen, or smartphone screen, "This is not an activity of the school or the School District." *Id.* Notably, this flyer, which looked similar to the sample flyer Ms. Everett had produced to the District in discussions with the District about TST's use of District facilities, differed in one key respect: It referenced the Saucon Valley Middle School in large font, in the center of the flyer. In contrast, the flyer Ms. Everett had shared with the District did not reference the District at all. *Id.* at ¶52.

The second social media post that was brought to the District's attention was posted on TST's national Facebook page, which has 258,000 followers on February 23, 2023, the day the District re-opened following the shooting threat. That post stated, "After School Satan Club is coming to Hellertown, PA! Saucon Valley Middle School will host the first ASSC open to both elementary and middle schoolers! *Id.* at ¶44. To register your student for Saucon Valley Middle School's After School Satan Club, please complete our online permission slip: https://tst.link/ASSCSignUp." *Id.*

Reviewing both social media posts, Superintendent Vlasaty determined that both violated the advertising restriction in Policy 707 because neither posted clearly communicated that the Club was not being sponsored by the District. (Vlasaty Affidavit, Exhibit "A" at ¶55). To the contrary, Superintendent Vlasaty determined that both posts strongly suggested the opposite conclusion. Because of this deliberate violation, under the authority to her granted in Policy 707, Superintendent Vlasaty decided to rescind TST's facility use application for the Club. The District later learned that the suspect who allegedly made the threat against the District had learned of the

connection between the Club and the District on Facebook, thereby demonstrating the importance of the advertising restriction in Policy 707.

### C.      Revisions to the District's Facility Use Policy

Following this security crisis and interference with the District's educational program, caused at least in part by TST's violation of Policy 707, and to prevent any further disruptions in the future, the District's Administration immediately began an overhaul of Policy 707 to help address potential security risks to it students and staff as a result of outside individuals and organizations renting District facilities. *Id.* at ¶70. To help ensure the safety of its students and staff, many of whom use the District's facilities immediately after the school day for District-sponsored extracurricular activities, educational remediation activities, meetings with parents, and other purposes tied to the District's educational program, the Administration determined that it was in the best interest of the District's students and staff to restrict the use of District facilities by outside individuals and organizations to times when District students and staff were less likely to be on-campus for school-related purposes. *Id.* at ¶71. Accordingly, the Administration recommended to the Board that Policy 707 be revised to allow non-District sponsored or affiliated organizations to rent District facilities only after 6:00 P.M. *Id.* at ¶72. This revision, along with others, to Policy 707 were approved by the Board on March 28, 2023, during a "first read" of the revised Policy. *Id.* at ¶73. It is expected to go into effect when the Board votes on it, as early as May 1, 2023, or, by July 1, 2023, for the start of the 2023-2024 school year. *Id.* at ¶74. Since the District's rescission of TST's approval to rent District facilities for the Club, the Club has, though counsel, requested reconsideration of that decision and has offered to allow the District approve all future advertising for the Club. Although the District is unwilling to grant that request, counsel for the District has advised counsel for TST that it would be willing to consider an application from TST to rent District facilities for the Club under the revised version of Policy 707. *Id.* at ¶78.

9

### III.    <u>ARGUMENT</u>

A preliminary injunction or a temporary restraining order ("TRO") is an extraordinary remedy granted only in limited circumstances. *Ferring Pharm., Inc. v. Watson Pharm., Inc*., 765 F.3d 205, 210 (3d Cir. 2014). Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a petitioner requests a TRO or preliminary injunction. *Thakker v. Doll*, 451 F. Supp. 3d 358, 364 (M.D. Pa. 2020) *citing Ellakkany v. Common Pleas Court of Montgomery Cnty.*, 658 Fed.Appx. 25, 27 (3d Cir. 2016). The main purpose of either form of this preliminary injunctive relief "is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharms., Inc. v. Andrx Corp*., 369 F.3d 700, 708 (3d Cir. 2004) (internal citation and quotation marks omitted). For that reason, "'[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.'" *Parkell v. Senato*, 639 Fed. Appx. 115 (quoting *Acierno*, 40 F.3d at 653).

That burden is high. In deciding to issue TRO or preliminary injunction, "a district court must carefully weigh four factors: (1) whether the movant has shown a reasonable probability of success of the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994). The movant bears the burden of showing that the factors weigh in favor of granting the injunction. *Kos Pharms. Inc. v. Andrx Corp*., 369 F.3d 700, 708 (3d Cir.2004). "Only if the movant produces evidence sufficient to convince the [court] that all four factors favor preliminary relief should the injunction issue." *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). Further, the movant must demonstrate that the

10

"preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). A TRO or preliminary injunction "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). For that reason, "upon an application for a preliminary injunction [or TRO] to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937). As detailed below, there is much to doubt about TST's argument, and TST cannot carry its burden to demonstrate that an alteration of the status quo is necessary or desirable.

A.   **TST Is Unlikely to Succeed on the Merits Because the District's Has Not Foreclosed TST From Renting Space in the District Nor Has It Discriminated Against TST on the Basis of Viewpoint or Content.**

Contrary to TST's assertion, the District has not foreclosed TST from renting space for the Club in the District, even though the current iteration of Policy 707 gives the District the authority to do so and TST's actions provide the District with the justification for it.[1] As counsel for the District explained to counsel for TST, the District is currently revising Policy 707, creating new viewpoint-neutral, reasonable restrictions borne out of a security need to protect its students and staff, a need that became even more critical as a result of TST's indiscriminate advertising campaign, insinuating that the Club was being sponsored by the District. These policy revisions are content neutral and apply to all non-school sponsored individuals and organizations seeking to use District facilities for non-school sponsored activities and programs. TST will be eligible to apply to rent District facilities for the Club under this revised policy, just as any other outside organization. Failing to acknowledge this, or perhaps to perpetuate its own narrative, TST

---

[1] As discussed above, under Policy 707, a group that has been found to have violated Policy 707 forfeits the right to submit future written requests to use school district property, unless otherwise decided by the Board.

continues to self-servingly portray the District's decision not to reconsider TST's initial facilities use application as nothing more than an unconstitutional attempt to appease those in the community who object to TST for one reason or another. But nothing could be further from the truth. Because the District's has security concerns that allowing outside individuals and groups to use the District's facilities before 6:00 P.M. could endanger students and staff who might still be on-campus for school-sponsored programming, the District has undertaken to change the terms of its facilities use by outside individuals and organizations, a process that is well underway. Once that process is complete, TST will again be permitted to apply to use District facilities like all other outside groups. That is not discrimination; it is a valid viewpoint-neutral and reasonable restriction.

It is well-established that when the State, or in this case a public school district, establishes a limited public forum, it is not required to, nor does it allow individuals or organizations to engage in every type of speech. *Good News Club v. Milford Central School*, 533 U.S. 98, 106 (2001). A public school district that has created a limited public forum may be justified "in reserving [its] forum for certain groups or for the discussion of certain topics." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The power to restrict speech is not absolute, however. The restriction must not discriminate against speech on the basis of viewpoint, *id.* at 829, and the restriction must be "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985). The District's decision to allow District facilities to be rented only after 6:00 P.M. on school days does not discriminate on the basis of viewpoint and it is reasonable in light of the District's overarching purpose to prioritize the safety of its students and staff while they are engaged in the activities that further the District's educational programming immediately after school hours.

Although in its brief, TST argues that the District has intentionally opened itself up "for indiscriminate use by the public as a place for expressive activity," likening it to a traditional public forum like a park or a sidewalk (TST Brief, ECF No. 12-4 at p. 17), which would mean that the school district would have even less control over speech on its property, that argument is without merit. As TST even acknowledges, under Policy 707, the Board has opened up the facilities of the school during non-school hours solely for "civic, cultural, educational, and recreational activities" that do not interfere with the District's own educational program, (*id.* at p. 18), activities which are consistent with the function of a public school, not any expressive activity that could be held in a traditional public forum like a public park or sidewalk. Further, the District's Administration has the discretion to grant or deny a facility use application under Policy 707 and must vet each facility use application to determine if the applicant has met all of the requirements of Policy 707, including the requirement that the proposed facility use is for a civic, cultural, educational, or recreational activity. (Policy 707, ECF No. 1-4 at p. 1).

Despite TST's argument to the contrary, the Administration's approval is not "ministerial" or "pro forma." Nor has TST pointed to any evidence that it is. (TST Brief, ECF No. 12-4 at pp. 18-19). The mere fact that the District has allowed a number of events to be held at District schools does not automatically transform the character of the facility it into a public forum. *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 47 (1983) (rejecting the argument that the school district had created a traditional public forum or a designated public forum by allowing of certain materials by outside groups to be distributed through the district's school mailboxes and inter-school delivery system, finding that there was no court finding or evidence which "demonstrate[d] that this permission ha[d] been granted as a matter of course to all who seek to distribute material . . . This type of selective access does not transform government

13

property into a public forum"). As the Supreme Court held in *Cornelius*, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum . . . The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.." *Id.* Neither the plain language nor the District's application of Policy 707 demonstrates an intent to open up the District's facilities indiscriminately as a place for assembly and debate.

Even if the Court was persuaded by TST's argument that the District had intentionally opened itself up as a designated public forum, the District's revision to Policy 707 would still pass constitutional muster. The Supreme Court has long recognized that a governmental entity may change the nature of the forum it creates. *See, e.g., Perry*, 460 U.S. at 46 ("[A] state is not required to indefinitely retain the open character of the [designated public forum]."). Further, even if the Court were to adopt TST's argument that the District's facilities after school hours were properly characterized as a designated public forum, the District's revisions to Policy 707 would still be constitutional as content-neutral, reasonable time, place and manner restrictions on the use of District facilities by outside individuals and organizations. Accordingly, TST will be unlikely to succeed on the merits of their claim that the District has violated the organization's First Amendment rights by preventing it from accessing District facilities. TST will be eligible to apply to use District facilities for the Club under the revised version of Policy 707, just as any other individual or organization seeking to rent District facilities for civic, cultural, educational, and recreational activities.

14

**B.     The District's Past Decision to Rescind TST's Facility Use Application Was Based on TST's Violation of Policy 707, Not Viewpoint Discrimination.**

When the Court examines the record, and not just TST's allegations, only one conclusion can be drawn: the decision to rescind the approval of TST's application resulted from TST's violation of Policy 707 and the ensuing disruption that violation caused to the District's educational program. TST's viewpoint and content-based discrimination arguments indeed rest on the supposition that the District only took the action it did because of opposition of some in the community to TST—that the District acted in response to the proverbial heckler's veto. TST puts forth no evidence in support of this self-serving allegation—an *ipse dixit* argument if there ever was one—and provides no basis for this Court to grant TST the extraordinary remedy of injunctive relief. Indeed, the evidence shows that even when faced with an avalanche of opposition to the Club from the community, and even after receiving the shooting threat, the District continued to make plans for the Club's use of the District's facilities. TST does not deny this fact, nor can it.

Nor can it credibly deny that it violated Policy 707 through the social media posts advertising the Club both to the local District community and nationwide. Both posts intentionally misled the public, both locally, in the case of the post on the Hellertown, PA Facebook page, and nationally, in the case of the post on TST's official Facebook page. Further, TST's argument that it did not "authorize any posts on social media regarding the ASSC on February 20" (TST Brief, ECF No. 12-4 at p. 11), referencing the post on the Hellertown, PA Facebook page, is completely disingenuous, belied by the fact that Ms. Everett, TST's official Campaign Director for the Club, "loved" the post as demonstrated below through a screenshot taken of the post:



*See* Exhibit "D" to Vlasaty Affidavit. As of the date of this filing, Ms. Everett's "love" reaction is

still on the original Facebook post from February 20, 2023, targeting District parents and

insinuating that the Club was being sponsored by the District. Because Ms. Everett is an official

representative of TST and, in fact, served as TST's liaison with the District regarding TST's

Facility Use Application, TST cannot credibly claim no knowledge or endorsement of this post

when the evidence indisputably demonstrates the opposite. Further, Ms. Everett knew that this post

to the Hellertown, PA Facebook page, including a flyer for the Club, was not the same flyer she

previously shared with the District's Administration earlier that day, a flyer which did not identify

the District anywhere, let alone in large font in the center of the flyer, and a flyer that would have

complied with the advertising restriction in Policy 707.

TST's arguments of unequal treatment are equally without merit. In its Complaint and brief, TST points to flyers for programs that the District has advertised on its own Facebook pages, that do not include disclaimer language that the activities were not being sponsored by the District. (TST brief, ECF No. 12-14). TST is correct that those activities were advertised on the District's Facebook pages without disclaimer language but that is because those activities *were actually being sponsored by the District*. Obviously, the promotional materials for activities sponsored by the District would not need to include language indicating the opposite. Specifically, TST points to the following programs that were advertised, without disclaimer language, on the District's Facebook pages: Girls on the Run, a Meet and Greet with Astronaut Terry Hart, organized by the Boy Scouts, the Joetta Sprots & Beyond Camp, a cheerleading open house organized by the Saucon Valley Youth Sports Association, and Saucon Valley Youth Basketball. *Id.* All of these activities or programs were vetted by the District's Administration as programming that the District chose to support to enhance the District's educational programming for its students, and none of them were subject to Policy 707 or the attendant facility use fees that accompany rental of the District's facilities under Policy 707. The District has had a relationship with Girls on the Run for several years, and the District's Collective Bargaining Agreement for professional staff even identifies it as a stipend-eligible extracurricular position for professional staff. (Vlasaty Affidavit, Exhibit "A" at ¶64). Because Girls on the Run is a long-established program of the District, facilitated by District employees, it only makes sense that the District would advertise Girls on the Run programs on its official Facebook pages, endorsing the program as an activity of the District. So too, for the other activities and programs referenced above. *Id.* at ¶65. All of those activities and programs were considered by the building administrators as programs that would enhance their schools' educational programming. *Id.* For that reason, they chose to advertise those programs on the

schools' official Facebook pages and to also include them programs in their newsletters to students' families.

Just as TST has First Amendment rights, so too, does the District. A government entity has the right to "'speak for itself.'" *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000)). "'[I]t is entitled to say what it wishes,' *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and to select the views that it wants to express, *see Rust v. Sullivan*, 500 U.S. 173, 194 (1991). Indeed, it is not easy to imagine how a government, or in this case, a public school district could function if it lacked this freedom. 'If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009) (quoting *Keller v. State Bar of Cal*., 496 U.S. 1, 12–13 (1990)). *See also Johanns v. Livestock Marketing Assn*., 544 U.S. 550, 574 (2005) (SOUTER, J., dissenting) ("To govern, government has to say something, and a First Amendment heckler's veto of any forced contribution to raising the government's voice in the 'marketplace of ideas' would be out of the question" (footnote omitted)). A public school district must therefore be able to exercise its freedom to express its own views, even when it receives assistance from private sources, such as the organizations referenced above, for the purpose of delivering its own school district-controlled message. *Pleasant Grove*, 555 U.S. at 468 (citing *Rosenberger*, 515 U.S. at 833, "a government entity may "regulate the content of what is or is not expressed . . . when it enlists private entities to convey its own message.") The District's exercise of its own freedom expression to promote certain extracurricular activities and programs should not be used as sword against it as a false demonstration of unequal enforcement of the advertising restriction in Policy 707. To compare

District-sponsored activities, not governed by Policy 707 with non-District sponsored ones that are, would be comparing apples to oranges. Accordingly, TST's argument of unequal enforcement of Policy 707 because of its promotion of these activities must fail.

TST's argument regarding the District's alleged better treatment of the GNC fares no better. The Administration reviewed the GNC's advertisements and determined that unlike TST's flyers for the Club, the GNC's flyers clearly communicated that the GNC was being sponsored by the Saucon Community Church and Child Evangelism Fellowship. Further, the Facebook posts advertising the GNC, which were not brought to the District's attention until the filing of this lawsuit, and were posted to the Saucon Community Church's Facebook page, did not suggest that the GNC was being sponsored by the District, like the Facebook posts for TST's Club, which stated that "Saucon Valley Middle School will host the first ASSC" and that the Club was "launching at Saucon." *Id.* at ¶57. Moreover, as the GNC is not meeting again for the remainder of this school year, even if the District determined that the GNC's advertising had violated the advertising restriction in Policy 707, there is no ongoing issue that the District would need to address. *Id.* at ¶61. As Superintendent Vlasaty explained to Ms. Everett in connection with TST's facility use application, under her Administration, the District's Administration has taken steps to ensure that the District is treating non-school sponsored organizations similarly, and to that end, has communicated to the building administrators that they may not disseminate materials for the GNC or any other non-school sponsored organization. Ms. Everett did not express any concern with that, and in fact, responded to Superintendent Vlasaty that "As long as everyone is under equal treatment moving forward—I am all for it!" TST has not pointed to—nor can it point to— any evidence of unequal treatment in which the District treated the Club and the GNC equally. To the contrary, what TST is asking for here it that the Club receive *preferential treatment* from the

District—that the District ignore TST's violation of Policy 707, and the ensuing disruption to the District's educational programming, and allow TST to proceed to rent District facilities, anyway.

As it is well established that neither a TRO nor a preliminary injunction should be granted "unless the movant, by a *clear showing*, carries the burden of persuasion," *Mazurek*, 520 U.S. at 972, and TST has not satisfied this burden, TST's motion for a TRO and/or preliminary injunction should be denied.

**C.    The Other Factors Necessary For the Issuance of a TRO or Preliminary Injunction Weigh Against TST.**

Just as TST has not demonstrated a likelihood of success on the merits in demonstrating that the District has violated TST's First Amendment rights, TST also has not carried its burden as to the other factors necessary the issuance of a TRO or preliminary injunction. Although the District recognizes the importance of an individual or organization's First Amendment rights, TST has not demonstrated a violation of those rights here. Even under the First Amendment, the District has the authority to make reasonable restrictions for the use of its facilities so long as those restrictions are reasonable in light of the purpose served by a public school district whose principal duty is to ensure the education and well being of this students.

This is a tremendously important responsibility, which has been recognized by both the Pennsylvania General Assembly and Pennsylvania courts, giving public school districts substantial discretion in adopting and enforcing rules regarding the management of their operations. Section 510 of the Public School Code of 1949 ("School Code") provides "[t]he board of school directors in any school district may adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding the management of its school affairs …." 24 Pa. Stat. Ann. § 5-510. As the Commonwealth Court has noted, "Section 510 of the School Code, 24 P.S. § 5–510, provides that the board of school directors in any school district may adopt and enforce such

reasonable rules and regulations as it may deem necessary and proper, regarding the management of its school affairs and the conduct and deportment of all pupils attending the public schools in the school district." *Flynn-Scarcella v. Pocono Mountain Sch. Dist.*, 745 A.2d 117, 120 (Pa. Commw. Ct. 2000). Further, "when one attacks a school board action on matters committed by law to its discretion, he has a heavy burden, as the courts are not prone to interfere unless it is apparent that the school board's actions are arbitrary, capricious, and prejudicial to the public interest." *Id.* "Courts should not attempt to function as super school boards when dealing with matters of school policy and generally should not interfere with the discretionary exercise of a school board's power." *Unionville-Chadds Ford Sch. Dist. v. Rotteveel*, 487 A.2d 109, 112 (Pa. Commw. Ct. 1985). As the District's enforcement of its policy is both consistent with its authority to regulate the operations of its schools under Section 510 of the School Code as well as its authority under First Amendment case law to impose reasonable, viewpoint neutral restrictions on individuals and organizations that seek to rent its facilities, granting TST a TRO or preliminary injunction is neither necessary for TST to avoid irreparable harm nor would be in the public interest. To the contrary, allowing TST to face no consequence as a result of its violation of the District's Facility Use Policy would be against the public interest and could have very real consequences for the District and its students and staff.

Unlike a federal courthouse, a large law firm's offices, or the headquarters of the ACLU, the District, as a public school district of just over 1,000 students, does not have armed security guards or metal detectors at every doorway. Security threats are significant—not just for the physical safety of the District's students and staff—but also for their mental and emotional health as well. The District would be frustrated in its ability to provide its students their constitutional right to a thorough and efficient education, *see*, *e.g.*, W*illiam Penn Sch. Dist. v. Pennsylvania*

*Department of Education*, 2023 WL 1990723 (Pa. Commw. Ct., Feb. 7, 2023), if it is unable to provide for their physical and emotional security, through reasonable restrictions regarding the use of District facilities. Allowing the Club to convene immediately after school hours, when TST has overtly violated the District's advertising restriction in its Facility Use Policy, leading to the security threat that occurred on February 21, 2023, and the necessary closure of District schools the following day, would not further the public interest and would in fact compromise it. In today's world of shooting threats and actual shootings in schools, the District has no room for error: it must be permitted to provide for the safety of its students and staff, especially when those efforts do not trample on anyone's, including TST's, First Amendment rights.

## IV.   CONCLUSION

For all of the foregoing reasons, the District respectfully requests that the Court deny TST's Motion for a TRO or Preliminary Injunction, and allow the District to move forward with considering a future facility use application from TST once the District's revised Policy has gone into effect.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

April 11, 2023                    By:    /s/ *Mark. W. Fitzgerald*
Mark W. Fitzgerald, Esquire
W. Christian Moffitt, Esquire
Beth N. Shore, Esquire
980 Jolly Road, Suite 110
Blue Bell, PA 19422-3001
Telephone:  (610) 397-6500
Fax:  (610) 397-0450
mfitzgerald@foxrothschild.com
*Counsel for Defendant*

144546806.3