IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THE SATANIC TEMPLE, INC., | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 5:23-cv-01244 |
| v. | : | |
| SAUCON VALLEY SCHOOL DISTRICT, | : | |
| Defendant. | : | |

## AFFIDAVIT OF JAIME VLASATY

I, Jaime Vlasaty, hereby declare as follows:

1. I am currently employed by the Saucon Valley School District ("District") as the District Superintendent, a role I have held since February 22, 2022, following the resignation of the then Superintendent in November 2021.

2. In this role, I oversee the District's educational program, staff, and facilities.

3. One of my important roles is ensuring the safety of the District's 1,998 students and 494 staff members, while ensuring that our students receive their constitutional right to a through and efficient education under the Pennsylvania Constitution.

4. On February 1, 2023, the District an application for Use of School Facilities from The Satanic Temple and Reason Alliance ("TST") to rent space in the District's Elementary School for the organization's After School Satan Club ("the Club"). The application sought permission to hold the Club in the District's Elementary School or Middle School on March 8, 2023, April 12, 2023, and May 10, 2023 from school dismissal to 4:30 p.m., during which participants would engage in STEAM activities.

5. The application was sent from June Everett, Campaign Director for the Club, and an Ordained Minister of TST. (Email Chain Between Everett and Vlasaty, Exhibit "A" at p. 1).

6. This application was made pursuant to District Board Policy 707, which governs the use of school facilities by "organizations, associations and individuals of the community for civic, cultural, educational and recreational activities." (Policy 707, ECF No. 1-4 at p.1).

7. Policy 707 provides in its "Purpose" statement that "[s]chool facilities of this district should be made available for community purposes, provided that such use does not interfere with the educational program of the schools." (Policy 707, ECF No. 1-4 at p. 1).

8. Policy 707 further provides "[i]t is the policy of the Board of School Directors of the Saucon Valley School District to make available the facilities of the school district to organizations, associations and individuals of the community for civic, cultural, educational, and recreational activities when the scheduling of these activities does not interfere with the educational program of the district." (Policy 707, ECF No. 1-4 at p. 1).

9. Under Policy 707, the Administration is charged with the responsibility of reviewing each request for use of facilities and, if all requirements are met, scheduling the use of facilities." (Policy 707, ECF No. 1-4 at p. 1).

10. The requirements are not onerous: "an individual or community group requesting permission to use school buildings, facilities, or school property must submit a written request on the prescribed application in advance of the proposed date to the Superintendent." The application requires the individual or community group applicant "specify the portion of the school facilities requested for use; proposed activities; number of individuals participating; and the date, time and duration of the proposed event." Along with the completed application, the individual or group must submit: evidence of organizational liability to limits required by district guidelines and

documentation evidencing the school district shall be held harmless by the user for any liability that arises from the use of school facilities by the individual or group." (Policy 707, ECF No. 1-4 at pp. 1-2).

11. The proposed use of District facilities must also be for community for civic, cultural, educational, and recreational activities. (Policy 707, ECF No. 1-4 at p. 1).

12. Because TST had met the requirements in Policy 707, I approved its Facility Use Application.

13. The District notified TST that its Facility Use Application had been granted on Thursday, February 16, 2023.

14. I also separately emailed Ms. Everett, making her aware of the Board Policy regarding the distribution of flyers for non-school affiliated organizations. (Email Chain Between Everett and Vlasaty at p. 5).

15. Later that day, Ms. Everett emailed me inquiring about flyers from the Good News Club ("GNC") that were sent home with students in the past, ostensibly in violation of the District's Board Policy governing the distribution of non-school materials. Ms. Everett also provided a GNC flyer from the 2021-2022 school year that had apparently been sent home from school with the child of one of the Club parent's children. (Email Chain Between Everett and Vlasaty, Exhibit "A" at pp. 6-7).

16. I explained to Ms. Everett that I am in my first year as Superintendent of the District but that when I learned that flyers from the GNC were being sent home with students, contrary to the District's Non-School Materials Policy, the District's Administration, specifically, Business Manager David Bonenberger, addressed this issue with the building administrators so that this oversight would not occur in the future. I further advised Ms. Everett that if any community

members received GNC flyers from school, they could reach out to me or their building principal, as the distribution of these flyers would not have been sanctioned by the District would need to be resolved. (Email Chain Between Everett and Vlasaty, Exhibit "A" at p. 7).

17.  Ms. Everett responded on February 17, 2023, that she understood and would be sure to let TST's parents know to reach out to me if they received a GNC flyer. (Email Chain Between Everett and Vlasaty, Exhibit "A" at p. 6).

18.  Ms. Everett further indicated that TST would "proceed forward with promoting the [After School Satan] club through our local congregation in the area, and local supporters." (Email Chain Between Everett and Vlasaty, Exhibit "A" at p. 7).

19.  I never received any further communications from Ms. Everett, or anyone else in the community, complaining about GNC flyers.

20.  On Monday, February 20, 2023, I began receiving emails and phone messages from District parents and community members who were confused and/or upset by the District sponsoring the Club.

21.  In response to these communications, I sent an email to District parents at 7:52 p.m. that evening explaining that the District had approved the Club to use school facilities after school hours but that Club was not a District approved club. (February 20, 2023 "A message from the Superintendent," ECF No. 1-6).

22.  Around the same time, District administrative staff and I continued communicating with Ms. Everett about logistical details regarding the Club's use of District facilities. (Email Chain Between Everett and Vlasaty, Exhibit "A" at pp. 10-14).

23. At approximately 5:00 p.m. the next day, February 21, 2023, an anonymous person left a voicemail at the District's Middle School's main telephone number, about "kids that have fun at the School Satan Club" saying he was going to "come and fucking shoot everybody."

24. The Middle School secretary who was already at home for the day retrieved the voicemail through her District email and promptly notified me.

25. I was still in my office at the District's Administration Building catching up on work from the day.

26. David Bonenberger, the District's Business Administrator, was also in the District's Administration Building at that time.

27. Mr. Bonenberger and I notified the Lower Saucon Police Department of the threat and within approximately six minutes made arrangements to clear the entire District campus of people.

28. Even though it was 5:00 p.m. on a Tuesday, there were still District students, parents, and staff on campus for youth basketball practice, girls basketball practice, wrestling practice, recreational swim, and a parent meeting of the Saucon Valley Music Connection booster organization that supports the High School's band and chorus program, all of which are District-sponsored extracurricular activities.

29. It was chaotic, and parents and staff were frightened.

30. Custodians barricaded themselves in various spaces in the buildings.

31. Parents rushed to the District to pick up their children.

32. Once the campus was clear, in consultation with the Lower Saucon Police Department and the District's private security team, I made the decision to close the District for the next day, Wednesday, February 22, 2023.

33. I did not make this decision lightly. Our District has always striven to remain open for our students. During the height of the COVID-19 pandemic, our District was the only public school district in our region that was open for in-person schooling 5-days a week.

34. Even when other security threats against the District were made in the past, the District did not have to close school.

35. I made the decision to close District schools on February 22, 2023, because unlike past threats the District has experienced that involved members of the District community, this threat was from an unknown individual, and the police were still in the process of investigating it.

36. The Lower Saucon Police Department worked in conjunction with other agencies, including the FBI, throughout the day on February 22, 2023, and was able to track the caller's cell phone, which gave me some comfort in re-opening the District on February 23, 2023, even though a suspect had not yet been apprehended.

37. We increased security on the District's campus on Thursday, February 23 and Friday, February 24, hiring additional personnel and extending the hours for our security coverage, costing the District an additional $6,352.50 in security fees for those two days. (Saints Logistics Invoice, Exhibit "B").

38. During that time, although the District was open, I continued to receive a number of phone calls and emails from frightened teachers and parents, some of whom, chose to keep their children home from school for the remainder of the week because they and/or their children were scared for their children to return to school due to the shooting threat. A sampling of the email communications I received are attached hereto as Exhibit "C."

39. Over the course of that 5 day-period, the other District administrators and I received over 40 phone calls and 50 emails or handwritten letters, daily, from concerned staff, parents, and community members.

40. I took each and every one of these communications very seriously as a long-time educator, parent, and as Superintendent of the District, responsible for ensuring the safety and wellbeing of all of the District's 1,998 students and 494 staff.

41. Even so, my staff and I continued to coordinate plans with the TST for its use of the District's Middle School for TST's Club. (Email Chain Between Everett and Vlasaty, Exhibit "A" at pp. 15-17).

42. During that time, I was also made aware by various community members of posts on social media about the Club made by members of TST.

43. The first social media post that came to my attention is attached hereto as Exhibit "D." The post was posted to the Hellertown, PA Facebook page by a person named Nikki Romy on Monday, February 20, 2023, the day I began receiving emails and phone calls about the Club.

44. The second social media post that was brought to my attention is attached hereto as Exhibit "E." This post was posted to the TST's national Facebook page on Thursday, February 23, 2023, the day after the District's schools were closed due to the anonymous shooting threat.

45. I determined that both posts violated Policy 707, which includes an advertising limitation on the way individuals and organizations renting the District's facilities advertise their activities or programs. Specifically, Policy 707 states, "When advertising or promoting activities held at school facilities, individuals and community groups shall clearly communicate that the activities are not being sponsored by the school district." (Policy 707, ECF No. 1-4).

46. The purpose of this advertising restriction in Policy 707 is to ensure that there is no confusion among the District's students, parents, staff, and community members, or anyone else, about activities and programs that are being sponsored by the District and those that are not.

47. The post on the Hellertown, PA Facebook page was directed to "Saucon parents" (i.e., District parents) and stated that Pennsylvania's very first After School Satan Club was "launching at Saucon" and that participants did not "have to be students of Saucon Elementary." From my perspective, the text of this post strongly indicated that the Club was being sponsored by the District, in contravention of the advertising restriction in Policy 707.

48. The post also included a flyer for the Club that identified "Saucon Valley Middle School" in large font in the center of the flyer, again indicating the Club was being sponsored by the District.

49. The very bottom of the flyer included language in very small font that was virtually illegible on a computer screen, tablet screen, or smartphone screen, "This is not an activity of the school or the School District." The first time I saw the flyer, I could not even see this language until I zoomed in on the flyer on my own computer screen.

50. I determined that this post on the Hellertown, PA Facebook page did not comply with the advertising restriction in Policy 707 as it did not clearly communicate that the Club was not being sponsored by the school district. To the contrary, I determined that it gave the opposite impression.

51. I also saw that the post was "loved" by Ms. Everett, who at TST's liaison with the District, was aware of the requirements in Policy 707. ("Hellertown, PA Facebook post," Exhibit "D" at p. 2).

52. I was especially surprised to learn that this post was "loved" by Ms. Everett because Ms. Everett had shared with the District a sample flyer/permission slip for the Club in an email thread on March 20, 2022. The flyer/permission Ms. Everett shared with the District differed from the one posted on the Hellertown PA Facebook page in that the flyer Ms. Everett shared did not include any reference to the District's Middle School. A true and correct copy of the sample flyer for the Club provided to the District by Ms. Everett is attached hereto as Exhibit "F."

53. The post on the TST Facebook page, which I noted has 258,000 followers, stated, "After School Satan Club is coming to Hellertown, PA! Saucon Valley Middle School will host the first ASSC open to both elementary and middle schoolers! To register your student for Saucon Valley Middle School's After School Satan Club, please complete our online permission slip: https://tst.link/ASSCSignUp."

54. Like the post on the Hellertown, PA Facebook page, I believed that the post on the TST national Facebook page strongly indicated that the Club was being sponsored by the District, in violation of Policy 707.

55. As a result of TST's violation of Policy 707 through these two Facebook posts, which significantly interfered with the District's educational program, I made the decision to rescind TST's approval to rent District facilities, as I have the authority to do under Policy 707, and notified TST of this decision on Friday, February 24, 2023. (February 24, 2023 Letter, ECF No. 1-8).

56. I dispute TST's contention that the District has not enforced Policy 707 equally against all non-school organizations that use District facilities. Other than these instances with TST, in my term as Superintendent, I have never had a circumstance in which an organization renting the District's facilities had violated the advertising restriction, necessitating further action.

57. The GNC advertisement, which TST cited in their complaint and motion, and which was brought to my attention by Ms. Everett in connection with TST's facility use application, in my view, clearly stated, at the top center of the flyer, in legible font, that it was sponsored by the Saucon Community Church and Child Evangelism Fellowship. Unlike the Facebook posts advertising the TST's Club, this flyer did not suggest that the GNC was being sponsored by the District. Accordingly, I do not view this flyer as a violation of the advertising restriction in Policy 707.

58. Until the filing of TST's Complaint, I was unaware of the Facebook posts by the Saucon Community Church advertising the GNC, but upon a review of these posts, I determined that those unmistakably indicated that the GNC was sponsored by the Saucon Community Church, unlike the Facebook posts advertising TST's Club, which suggested the Club was being sponsored by the District. Accordingly, I do not believe that those social media posts violated Policy 707.

59. Moreover, even prior to TST's facility use application, when I learned that flyers from the GNC had been sent home with District students in the past, I immediately addressed this issue with the District's building administrators and the GNC itself to ensure that this oversight would not reoccur.

60. Since then, I have not received any further complaints from representatives from TST or anyone else in the community that GNC flyers have been sent home with District students this year.

61. Further, the GNC meetings are over for the 2022-2023 school year as their last scheduled meeting was in March, so even if I determined now that the GNC flyers were problematic, there would be no action for me to take now.

62. During my tenure as the District's Superintendent, other than TST, no organization renting District facilities has violated the advertising restrictions in Policy 707, to my knowledge.

63. The examples cited by the TST in their Complaint and Motion, Girls on the Run, the Boy Scouts program with Astronaut Terry Hart, the Joetta Sports and Beyond Track & Field Camp, the Cheerleading Open House put on by the Saucon Valley Youth Sports Association, and Saucon Valley Youth Basketball, were programs that had been vetted by District administrators and actively promoted as District-sponsored activities that District administrators had determined enhanced the District's educational programming. For that reason, none of these programs were subject to the advertising restriction in Policy 707 as Policy 707 did not apply to them. Nor, because of their District-sponsorship, were charged facility use rental fees by the District.

64. By way of further explanation, the District has had a relationship with Girls on the Run for several years, and the District's Collective Bargaining Agreement for professional staff even identifies it as a stipend-eligible extracurricular position for professional staff. Because Girls on the Run is a long-established program of the District, facilitated by District employees, it only makes sense that the District would advertise Girls on the Run programs on its official Facebook pages.

65. The Boy Scouts program with Astronaut Terry Hart, the Joetta Sports and Beyond Track & Field Camp, the Cheerleading Open House put on by the Saucon Valley Youth Sports Association, and Saucon Valley Youth Basketball were programs the District's Administration had vetted and included in the Principals' newsletters as programs of interest for District students and families, which is why they were also advertised on the District's official Facebook pages.

66. I am unaware of the District's relationship or publicity of the Lion Club's Gem, Mineral & Jewelry Show in the past as the Lion's Club has not rented District facilities since 2019, well before my time as Superintendent.

67. Three days after I rescinded TST's approval to rent District facilities, I was advised by the Lower Saucon Police Department that an individual suspected of making the shooting threat against the District had been arrested in North Carolina, held on $75,000 bail.

68. The press reported that the suspect had "found out about the district's approval of the club on Facebook." https://www.wfmz.com/news/area/lehighvalley/north-carolina-man-charged-in-threat-that-closed-saucon-valley-schools/article_c0fb1d24-b783-11ed-9df9-7ffd9d979d38.html (last accessed Apr. 11, 2023).

69. It is my understanding as of the date of this Affidavit that the suspect has not yet been extradited to Pennsylvania, and the investigation is still open.

70. Following the disruption to the District community and the education of the District's 1,998 students between February 22-24, 2023, the District immediately began an overhaul of Policy 707 to help prevent future potential security risks to its students and staff as a result of outside individuals and organizations renting District facilities.

71. To help ensure the safety of its students and staff, many of whom use the District's facilities immediately after the school day for District-sponsored extracurricular activities, educational remediation activities, meetings with parents, and other purposes tied to the District's educational program, the Administration determined that it was in the best interest of the District's students and staff to restrict the use of District facilities by outside individuals and organizations to times when District students and staff were less likely to be on-campus for school-related purposes.

72. Accordingly, the Administration recommended to the Board that Policy 707 be revised to allow non-District sponsored or affiliated organizations to rent District facilities only after 6:00 p.m.

73. This revision, along with others, to Policy 707 were approved by the Board on March 28, 2023, during a "first read" of the revised Policy.

74. It is expected to go into effect when the Board votes on it, as early as May 1, 2023 or, by July 1, 2023, for the start of the 2023-2024 school year.

75. Since the District's rescission of TST's approval to rent District facilities for the Club, the Club has, though counsel, requested reconsideration of that decision and has offered to allow the District approve all future advertising for the Club.

76. Under Policy 707, the District is not obligated to reconsider TST's application, and in fact, the Policy states that "[i]n the event an individual or community group violates this policy . . . that individual or community forfeits the right to submit future requests to use school district property, unless otherwise decided by the Board." (Policy 707, ECF No. 1-4).

77. Given the substantial interference with the District's educational program caused by TST's violation of the advertising restriction in Policy 707, and lingering concerns about the safety of its students and staff, the District is not willing to reconsider TST's application to convene immediately at dismissal time.

78. The District is, however, willing to consider a future application from TST under the revised Policy 707, which will limit all activities by outside organizations, to begin at 6:00 p.m. Counsel for the District has informed TST of this position.



I declare under penalty of perjury that the above is true and correct.

Date: 4.11.23

_____
Jaime Vlasaty

14

144496980.2
144496980.3