**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————

| | | |
|---|---|---|
| THE SATANIC TEMPLE, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:23-cv-01244-JMG |
| | : | |
| SAUCON VALLEY SCHOOL DISTRICT, | : | |
| Defendant. | : | |

———————————————————————

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                           **May 1, 2023**

### I.   OVERVIEW

When confronted with a challenge to free speech, the government's first instinct must be to forward expression rather than quash it. Particularly when the content is controversial or inconvenient.[1] Nothing less is consistent with the expressed purpose of American government to secure the core, innate rights of its people.

Here, although The Satanic Temple, Inc.'s objectors may challenge the sanctity of this controversially named organization, the sanctity of the First Amendment's protections must prevail. Indeed, it is the First Amendment that enumerates our freedoms to practice religion and express our viewpoints on religion and all the topics we consider sacred. Though the "First Amendment is often inconvenient" depending on one's perspective, or responsibilities, this inconvenience "does not absolve the government of its obligation to tolerate speech." *Int'l Soc'y*

———

[1] Even when faced with speech we deem offensive, the solution is "more speech, not less." Nadine Strossen, Freedom of Speech and Equality: Do We Have to Choose?, 25 J. L. & Pol'y (2016); *See also Whitney v. Cal.*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("the remedy to be applied is more speech.").

*for Krishna Consciousness v. Lee*, 505 U.S. 672, 701 (1992) (Kennedy, J., concurring). "**Even in the school setting**, a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint is not enough to justify the suppression of speech." *Child Evangelism Fellowship of N.J. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 528 (3d Cir. 2004) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393, U.S. 503, 509 (1969)) (emphasis added, internal quotations omitted).

At this stage of litigation, because the record before the Court indicates the decision of Defendant, Saucon Valley School District, to rescind approval of the After School Satan Club's ("ASSC") use of District facilities was based on The Satanic Temple's controversial views on religion and the community's negative reactions thereto, the Court Grants in Part and Denies in Part The Satanic Temple's motion for preliminary injunctive relief. For the reasons that follow, the District must permit the ASSC to meet at the location and on the dates upon which the parties contingently agreed (ECF No. 23) during the current school year. The District is not required, however, to distribute ASSC's permission slip to students.

## II.   <u>BACKGROUND</u>
### a.  The Parties

Plaintiff, The Satanic Temple, Inc. ("TST") "is a non-theistic, religious not-for-profit corporation" that "has been recognized by the IRS as a church…and as a religious corporation." *See* Complaint at ¶¶ 13, 15 [ECF No. 1]. Plaintiff, TST, "does not worship Satan," but rather regards "Satan…as a literary figure who represents a metaphorical construct of rejecting tyranny, championing the human mind and spirit, and seeking justice and egalitarianism for all." *Id.* at ¶ 21. TST "has more than 700,000 individual members" who believe in the "seven Satanic virtues: benevolence, empathy, critical thinking, creative expression, personal sovereignty, compassion,

and the pursuit of justice." *Id.* at ¶¶ 14, 23. TST sponsors the After School Satan Club ("ASSC" or the "Club") at "a number of public schools across the country to provide young people with an alternative to other religious clubs that meet on campus after school." *Id.* at ¶ 1.

Defendant, Saucon Valley School District (the "District"), is a public school district of 1,988 students, located in Northampton County, Pennsylvania. *See* Defendant's Brief in Opposition to Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction at pg. 7 of 26 [ECF No. 27]; Affidavit of Jamie Vlasaty at ¶ 3 [ECF No. 27-1]. "Like many other public school districts in Pennsylvania, the District makes its facilities available for outside organizations and individuals to rent outside of school hours." Defendant's Brief at pg. 7 of 26 [ECF No. 27]. Jamie Vlasaty, hereinafter referred to as the "District Superintendent" or "Superintendent," is the current Saucon Valley School District Superintendent, having held the position since February 22, 2022. Vlasaty Affidavit at ¶ 1 [ECF No. 27-1].

### b. District Board Policy 707, "Use of School Facilities"

The District's process for approving individual and community group use of its facilities is governed by the District's Board Policy 707 ("Policy 707"). Defendant's Brief at pg. 7 of 26 [ECF No. 27]. Policy 707 states: "It is the policy of the Board of School Directors of the Saucon Valley School District to make available the facilities of the school district to organizations, associations and individuals of the community for civic, cultural, educational and recreational activities when the scheduling of these activities does not interfere with the educational program of the district." *See* Board Policy 707 at pg. 2 of 6 [ECF No. 1-4]; Defendant's Brief at pg. 7 of 26 [ECF No. 27]. "In furtherance of this overarching purpose, Policy 707 establishes the procedures individuals and community groups must follow to obtain approval to use District facilities as well as the rules they must abide to once that approval is granted." Defendant's Brief at pg. 8 of 26

[ECF No. 27]. According to the District, the "responsibility of reviewing each request for use of facilities, and, if all requirements are met, scheduling the use of facilities" rests with "the Administration (i.e., the District Superintendent and her staff)." *Id.*

Because the District sponsors some after-school activities and groups, such as "Girls on the Run," "the Boy Scouts," "the Joetta [Sports] & Beyond Camp," the "Saucon Valley Youth Sports Association," and "Saucon Valley Youth Basketball," groups approved for use of District facilities that are *not* sponsored by the District must abide by the following Policy 707 limitation, hereinafter referred to as the "Advertising Restriction":

> When advertising or promoting activities held at school facilities, individuals and community groups shall clearly communicate that the activities are not being sponsored by the school district.

Defendant's Brief at pg. 21 of 26 [ECF No. 27]; then quoting Board Policy 707 at pg. 4 of 6 [ECF No. 1-4]. Policy 707 also prohibits individuals and community groups from using school facilities for possession, use, or distribution of illegal drugs, tobacco products, and/or alcohol; possession of weapons; engaging in conduct that may damage property; engaging in conduct that violates state or federal law; and gambling. Board Policy 707 at pg. 5 of 6 [ECF No. 1-4].

Lastly, Policy 707 provides that the District "reserves the right to remove from the school district premises any individual or community group who fails to comply with the terms and conditions of this policy and established procedures."  *Id.*

### c.  Factual Summary

On February 1, 2023, TST applied for use of District facilities to hold TST's After School Satan Club ("ASSC") on March 8, 2023, April 12, 2023, and May 10, 2023 from school dismissal until 4:30 p.m. Vlasaty Affidavit at ¶ 4 [ECF No. 27-1]; Compl. at ¶ 35 [ECF No. 1]. In addition to meeting space, the application also requested tables and chairs for 3 volunteers and an estimated

5-10 attendees. *See* Defendant Saucon Valley School District Index of Exhibits for April 20, 2023 Hearing, Ex. S-6. [ECF No. 32]. The District granted TST's application to use District facilities at the District's Middle School on February 16, 2023. Vlasaty Affidavit at ¶ 13 [ECF No. 27-1]; Compl. at ¶ 37 [ECF No. 1]. The District Superintendent approved TST's application "[b]ecause TST had met the requirements in Policy 707." Vlasaty Affidavit at ¶ 12 [ECF No. 27-1].

During discussions between District officials and TST about TST's use of District facilities, June Everett, Campaign Director for ASSC, shared a sample flyer advertising the ASSC with District officials ("Sample Flyer"). Defendant's Brief at pg. 12 of 26 [ECF No. 27]; Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-7. [ECF No. 32]. The Sample Flyer is titled "Hey Kids! Let's Have Fun at After School Satan Club!," states it is "Sponsored by: The Satanic Temple and Reason Alliance," and contains a small-print disclaimer (the "Disclaimer") at the very bottom of the flyer stating:

> The United States Constitution requires schools to respect the right of all external organizations to distribute flyers to students at school if the school permits any such organization to distribute flyers. Accordingly, the school cannot discriminate among groups wishing to distribute flyers at school and does not endorse the content of any flyer distributed at school. The school encourages parents to assist their children in making choices appropriate for them. This is not an activity of the school or School District.

Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-7. [ECF No. 32].

On February 20, 2023, the District Superintendent "began receiving phone calls and emails from District parents and community members expressing concern about the District's sponsorship of the TST's Club." Defendant's Brief at pg. 9 of 26 [ECF No. 27]. "In response to these concerns," at 7:52 P.M. that same day, February 20, 2023, the District Superintendent "issued a letter via email to the entire District community explaining that the District had approved [TST's] Club to use school facilities after school hours, but that the Club was not a District approved club."

Defendant's Brief at pg. 9 of 26 [ECF No. 27]. The text of this e-mail was also posted on the

District's Facebook page, though this post has since been deleted. Compl. at ¶ 48 [ECF No. 1].

The Superintendent's February 20, 2023 statement reads in pertinent:

> The District has long held policies and procedures in place which allow varied
> community groups to use our publicly-funded facilities outside of the school day.
> This is common practice among school districts around the state and nation.
> Religious groups are among those the District has allowed to rent our facilities over
> the years. By law, the District cannot discriminate among groups wishing to use the
> SVSD facilities.
>
> Consistent with the law and criteria set out in SVSD Board policy and regulations,
> the District has approved an organization known as the "After School Satan Club"
> (ASSC) to host gatherings after school hours, in the Saucon Valley Middle School.
> Students must have parent permission to attend any after school event hosted by
> any outside organization.
>
> It is very important to note that the District does not endorse any of the groups or
> content affiliated with groups that host after school events on District property. It
> is also important to note that the ASSC is not a District approved club.

*See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-11. [ECF No. 32]. The

following evening, at approximately 5:00 P.M. on February 21, 2023, "an anonymous person left

a voicemail at the District's Middle School's main telephone number, about 'kids that have fun at

the School Satan Club' saying he was going to 'come and fucking shoot everybody.'" Vlasaty

Affidavit at ¶ 23 [ECF No. 27-1]. After receiving the threat, the District closed for the following

day, February 22, 2023 out of safety concerns. *Id.* at ¶ 32. On February 22, 2023, the

Superintendent issued another statement to the Saucon Valley Community, advising that "a threat

was left on voicemail by an unknown male and referenced our decision to allow the Satan Club to

use our facility after school" and therefore a decision was made to close all schools in the District

for February 22, 2023. *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-12.

[ECF No. 32]. The Superintendent's February 22, 2023 Statement also stated:

> In making the decision to follow the facility use policy regarding non district
> affiliated clubs and organizations, I could not anticipate the substantial disruption

> it has caused our students and staff through the threat, school closure and
> cancellation of student activities last evening. Due to this disruption and threat to
> the safety and welfare of our students and staff, I will be recommending a full
> review of the Satan Club's use of our facility.

*Id.* After local and national law enforcement agencies were able to track the caller's cell phone

location, the District made the decision to re-open on February 23, 2023 with additional security

paid for by the District. Vlasaty Affidavit at ¶ 23 [ECF No. 27-1].

During this time, the District and Superintendent "received over 40 phone calls and 50

emails or handwritten letters, daily, from concerned staff, parents, and community members." *Id.*

at ¶ 39. Indeed, Defendant's exhibits include numerous e-mail exchanges between the District

Superintendent and community members/parents, including:

(1) A February 22, 2023 e-mail from a parent stating "At what point do we prioritize the

safety and education of our students over a club that is allowed to meet after school? Having to

cancel school impacts every family in the district. I understand that the school cannot discriminate

over the groups that use the building but if it impacts the safety and security of the school, action

must be taken."; (2) A February 21, 2023 e-mail from a parent stating "I wanted to email you

regarding the Satan After School Club which has been approved by the district…While I know

they are protected by the first amendment I am petitioning to remove all religious clubs/after school

groups. Let the decision be left outside of schools for the parents to introduce what they feel is

appropriate to their children when they feel it is appropriate."; (3) A February 23, 2023 e-mail

stating "I wanted to take a moment to contact you regarding the After School Satan Club that you

are promoting inside your school…To my knowledge, schools are not permitted to host nor

promote religion. Certainly, hosting satanic activities is promoting a religion."; (4) A February 21,

2023 e-mail stating "As a proponent of public secular education, I support this decision. Equality

in public spaces, what's fair is fair, or better yet no religiously affiliated organizations should be allowed within publicly funded District facilities whatsoever."; (5) A February 20, 2023 e-mail stating "You are as weak as lame duck President Biden. You should be ashamed for bowing to woke policy instead of standing up for what's right."; (6) A February 21, 2023 e-mail stating "I appreciate the heads up regarding this new 'club/organization.' My concern lies with the hours this would occur. I would be horrified if there would be a chance of them running into my children, as I am of the belief that these types of organizations intentionally choose schools as a potential way to access children."; (7) A February 20, 2023 e-mail stating "as the superintendent you need to fight back for this school. Saying yes just because the school isn't allowed to discriminate against such clubs is not a good enough excuse for me!! I'm sure I can think of 100 or more people that would back you and fight with you to get this out of saucon valley immediately!"; (8) A February 22, 2023 e-mail stating "Then please shut down all religious after school Clubs if that's what needs to be done to keep Satan out of that building…Change the policy or fight the law."; (9) A February 21, 2023 e-mail stating "How exactly does this provide a safe environment for our children? What's next the after school heroin club? Is the school going to put up a fight on that one or just let it go through because of discrimination? Who is running this organization and club? And what is the contact information? Is this supervised by a teacher?"; (10) A February 23, 2023 e-mail stating "Let's be honest here. Satan is already in your schools. All I needed to do was take a look at the disgusting books in your ELEMENTARY school library to dissuade me from sending my children there. Approving a Satan club simply makes it official. You can go on and on about the Supreme Court ruling, but again I say to you that yours is the first school district in all of Pennsylvania that accepted this club. Others said no and welcomed the lawsuit. They are at least attempting to do what is right."; (11) A February 23, 2023 e-mail stating "Although the decision

to have an After School Satan Club is one that I personally disagree with, I understand the importance and legalities of being fair, equitable, and tolerant of all beliefs, and allowing equal access to school district facilities is what you are asked to do."; (12) A February 21, 2023 e-mail stating "I'm writing as a concerned parent…I'm actually a bit in awe that this campus is giving in to this type of ridiculous one sided religious behavior. I myself am not a religious person, but the work of evil, I would hope would be avoided in any place where children are meant to be kept safe from that very thing…Evil. Maybe such clubs should be held at a community center in a natural environment? Since our school is non religious?'"; and (13) A February 22, 2023 e-mail from a parent stating "While I understand the first amendment freedom of religion/assembly, I am puzzled at the school allowing for a group that claims religious affiliation with 'Satan', not because they believe in Satan or religion for that matter, but use the term to merely be provocative. Given these highly charged times wouldn't it have been wiser to revoke all and any 'religious' groups charters rather than place the most vulnerable of our youth in harms way of a clearly foreseeable outcome?" *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-16, S-17. [ECF No. 32].

Also during this time, the District became aware of two posts on social media advertising the ASSC by persons affiliated with TST. Vlasaty Affidavit at ¶ 23 [ECF No. 27-1]. The first such post was made on Facebook by a person named Nikki Romy on February 20, 2023, the day the Superintendent began receiving calls about the ASSC. *Id.* at ¶ 43; Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-8; S-9. [ECF No. 32]. The second post was made by TST's national Facebook page on February 23, 2023. Vlasaty Affidavit at ¶ 44; Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-10. [ECF No. 32]. The District contends both of these posts violated its Advertising Restriction in Policy 707 because neither post "clearly communicated that the Club was not being sponsored by the District." Defendant's Brief at pg. 12

of 26 [ECF No. 27].

As to the February 20, 2023 Facebook post, the District alleges the post violated Policy 707 because it advertised ASSC to "Saucon parents" and states "Pennsylvania's very first After School Satan Club is launching at Saucon." Defendant's Brief at pg. 11 of 26 [ECF No. 27]; Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-8. [ECF No. 32]. The post also attached a flyer for the Club that, according to the District, "looked similar" to the Sample Flyer that "Ms. Everett had produced to the District in discussions with the District about TST's use of District facilities" but "differed in one key respect: It referenced the Saucon Valley Middle School in large font, in the center of flyer." Defendant's Brief at pg. 12 of 26 [ECF No. 27]. As with the Sample Flyer, the flyer attached to the February 20, 2023 Facebook post states ASSC is sponsored by TST and includes the same Disclaimer. Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-8; S-9. [ECF No. 32]. Moreover, although the District admits it is unaware who Nikki Romy, the author of the post is, the District notes Ms. Everett, ASSC's official Campaign Director, engaged with the Facebook post by clicking the "love" button. Defendant's Brief at pgs. 19-20 of 26 [ECF No. 27]; Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-8. [ECF No. 32].

As to the February 23, 2023 Facebook post from TST's national Facebook page, this post was made the day after the District re-opened following the shooting threat and stated "After School Satan Club is coming to Hellertown, PA! Saucon Valley Middle School will host the first ASSC open to both elementary and middle schoolers!" Defendant's Brief at pg. 12 of 26 [ECF No. 27]; Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-10. [ECF No. 32]. Although the post included a link to an "online permission slip," the post attached a picture of a flyer completely unlike the Sample Flyer. The attached flyer included a statement the Club was

10

sponsored by TST, but did not include the Disclaimer featured in the Sample Flyer. Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-10. [ECF No. 32]. The flyer also indicated the Club was being held at "Saucon Valley Middle School" and provided an address. *Id.*

Based on these two Facebook posts, the District concluded TST violated the Advertising Restriction under Policy 707, and on February 24, 2023, the District rescinded its approval for TST to use District facilities. Vlasaty Affidavit at ¶ 55; Defendant's Brief at pg. 12 of 26 [ECF No. 27]. That same day, the District Superintendent issued a statement announcing the decision to rescind approval for TST. Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-13. [ECF No. 32]. The Superintendent's February 24, 2023 statement reads:

> After approval was given to The Satanic Temple and Reason Alliance's (TSTRA) application for facility use on February 16, 2023, the TSTRA failed to meet the District requirements outlined in School Board Policy 707, subsequently violating the policy.

> As a result of this violation, the educational programming and activities of the District has been significantly impacted and it has caused unequivocal disruption to the District's daily operations.

> Our community has experienced chaos. Our students, staff and teachers have had to endure a threat to their safety and welfare. The gravity of feelings of instability, anxiety and fear have been profound.

> Aside from my decision to rescind approval, I implore the Saucon Valley community to eliminate threatening, hateful and divisive language and behavior, and make a commitment in supporting our students and reinforcing the values of our community.

> I firmly believe that we can create a safe and inclusive environment within our District where everyone is respected and valued no matter their opinions and beliefs, but we must first model this within our homes, our community and with one another.

*Id.*

On March 2, 2023, counsel for TST sent a letter to the District's solicitor "advising the District that its decision to deny ASSC access to school facilities for club meetings violates the

First Amendment." Compl. at ¶ 86 [ECF No. 1]. On March 7, 2023, the District responded by stating it "will be standing by its decision in this matter." *Id.* at ¶ 87. On March 17, 2023, counsel for TST sent an e-mail to the District solicitor asking "whether the District would allow ASSC to use school facilities for its meetings if the ASSC included a disclaimer on its advertising materials that was acceptable to the District." *Id.* at ¶ 88. The District solicitor responded on March 30, 2023, advising "The District will not be revisiting the application this year due to the proximity of the disruptive events from last month. This does not foreclose the Satanic Temple from applying for use in the future, however not at this time." *Id.* at ¶ 90. Later that same day, TST initiated the instant action.

### d. Procedural History

TST initiated this action by filing a Complaint against the District on March 30, 2023 ("Complaint"). [ECF No. 1]. TST's Complaint alleges the District's "decision under Policy 707 to rescind approval of TST's application and prohibit ASSC from using school facilities is unconstitutionally based on the viewpoint and/or content of Plaintiff's speech, including Plaintiff's particular religious viewpoint." *Id.* at ¶ 145. Specifically, TST alleges the District's decision under Policy 707 "is based on an unconstitutional heckler's veto arising from community members' and others' disagreement with, and hostility toward, the viewpoint and/or content of Plaintiff's speech, as well as animus toward Plaintiff's religion." *Id.* at ¶ 146. TST brings claims for violation of the First Amendment's Free Speech, Establishment, and Free Exercise Clauses, as well as for violation of Article I, § 7 of the Pennsylvania Constitution. *Id.* at ¶¶ 142-175. The Complaint seeks declaratory, injunctive, and monetary relief. *Id.* at pgs. 35-36 of 37.

The next day, on March 31, 2023, TST filed the instant Motion for Temporary Restraining Order And/Or Preliminary Injunction (the "Motion"). [ECF No. 19]. The Motion seeks an order

declaring: (1) The District must permit the ASSC to meet at the Saucon Valley Middle School at the times and on the days previously approved by the District; (2) ASSC must be permitted to reschedule its missed meeting from March; (3) The District must distribute ASSC's permission slip for students to take home in the same manner that it has previously distributed permission slips for other organizations; (4) The District shall not impose any other unconstitutional conditions on TST or the ASSC; (5) The District shall not retaliate against TST, the ASSC, or any member or attendee of ASSC meetings for objecting to the District's unlawful practices and bringing this action, including with respect to any future uses of District facilities beyond this school year. *Id.* at pgs. 4-5 of 69.

Following an April 3, 2023 Telephonic Status Conference with the parties [ECF No. 21], the Court Ordered the District to Respond to TST's Motion no later than 2:00 P.M. on April 11, 2023. [ECF No. 22]. The Court also ordered the parties to confer and determine contingent dates and locations for a total of three ASSC meetings to take place before the end of the current school year, in the event Plaintiff's Motion is granted. *Id.* On April 6, 2023, the parties jointly advised the Court that "the parties have conferred and agreed upon the following contingent dates for meetings of the After School Satan Club: May 10, 2023, May 17, 2023, and May 31, 2023, tentatively at the previously-approved location in the Saucon Valley Middle School Large Group Instruction ("LGI") Room." [ECF No. 23].

Defendant filed a Response In Opposition to Plaintiff's Motion for a Temporary Restraining Order And/Or Preliminary Injunction on April 11, 2023 ("Response"). [ECF No. 27]. In-person oral argument on the Motion was held on April 20, 2023. [ECF No. 29]. At oral argument, the parties submitted supplemental exhibits [ECF Nos. 28, 32], and the Court heard testimony from the District Superintendent. [ECF No. 29]. On April 27, 2023, the Court Ordered

the parties to submit supplemental briefing on the issue of the "substantial disruption" test/doctrine. [ECF No. 35]. The parties submitted their supplemental briefs on April 28, 2023. [ECF Nos. 36, 37]. The Motion is now ripe for adjudication.

### III.   <u>LEGAL STANDARD</u>

A motion for a preliminary injunction may seek either "prohibitory" or "mandatory" relief. *C.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 438 (E.D. Pa. 2021). A prohibitory injunction is more common, and "maintains 'the status quo until a decision on the merits of a case is rendered.'" *Id.* (quoting *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994)). A mandatory injunction "alters the status quo by commanding some positive action or providing the moving party with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Id.* (quoting *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 358 (M.D. Pa. 2020)). The status quo is defined as "the last peaceable, non-contested status between the parties." *Id.* at 439 (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). Courts have authority to issue either prohibitory or mandatory injunctive relief. *Mylan, Inc. v. Kirkland & Ellis LLP*, No. 15-581, 2015 U.S. Dist. LEXIS 194338 at *22 (W.D. Pa. June 9, 2015) ("courts have consistently recognized their power to enter a mandatory injunction, particularly when necessary to restore the *status quo ante*.") (emphasis in original).

Here, because the "relationship that existed between the parties before the wrongdoing complained of" was TST's status as an approved user of school facilities, TST's Motion seeks a prohibitory injunction preventing the District from barring its previously approved use of school facilities. *Mylan, Inc.*, 2015 U.S. Dist. LEXIS 194338 at *20; *see also* Compl. at ¶ 37. That the District revoked TST's status as an approved user of school facilities at the time of this litigation

does not alter the foregoing analysis. *See Mylan, Inc.*, 2015 U.S. Dist. LEXIS 194338 at \*20-21 ("As the Pennsylvania Supreme Court long ago explained…The modern cases…have established the rule that the status quo which will be preserved by preliminary injunction is the last actual, peaceable, noncontested status which preceded the pending controversy, and equity will not permit a wrongdoer to shelter himself behind a suddenly or secretly changed status.") (quoting *Fredericks v. Huber*, 180 Pa. 572, 575 (1897)).

In a typical case involving a motion for a preliminary injunction, "[t]he established four-prong test…is: (1) whether the moving party has shown a reasonable probability of success on the merits; (2) whether the moving party would be irreparably injured by denial of the preliminary relief requested; (3) whether granting the preliminary relief would result in even greater harm to the non-moving party; and (4) whether granting the preliminary relief was in the public interest." *Jackson Hewitt Inc. v. Madan*, 83 Fed. Appx. 417, 419 (3d Cir. 2003). "Courts balance these factors once the moving party 'meets the threshold on the first two.'" *Doe v. Governor of Pa.*, 790 Fed. Appx. 398, 402 (3d Cir. 2019) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017)).

"In First Amendment cases, though, the first prong—likelihood of success—works differently: A plaintiff need demonstrate only a colorable claim that his rights have been infringed before the burden shifts to the government, which must justify the law under the relevant level of scrutiny." *Id.* "This is because 'the burdens at the preliminary injunction stage track the burdens at trial,' and for First Amendment purposes they rest with the government." *Id.* (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.*, 546 U.S. 418, 429 (2006)). "In evaluating whether a moving party has satisfied this first part of the preliminary injunction standard, 'it is not necessary that the moving party's right to a final decision after trial be wholly

without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing

a reasonable probability that it will prevail on the merits." *Child Evangelism Fellowship of N.J. v.

Stafford Twp. Sch. Dist.*, 233 F. Supp. 647, 655 (D. N.J. 2002) (quoting *Oburn v. Shapp*, 521 F.2d

142, 148 (3d Cir. 1975)).

Although a preliminary injunction is "an extraordinary remedy never awarded as of right"

and "should only be awarded in 'limited circumstances", the ultimate "decision of whether to issue

a preliminary injunction is left to the sound discretion of the district court." *Schrader v. Sunday*,

603 F. Supp. 3d 124, 133 (M.D. Pa. 2022) (quoting *Holland v. Rosen*, 895 F.3d 272, 285 (3d Cir.

2018)).

IV.     **ANALYSIS**
  a.   **TST Has a Reasonable Probability of Success on the Merits**
      i.   **TST States a Colorable Claim its First Amendment Rights Have Been Infringed; Burden Shifts to District to Justify Its Restriction**

Because Plaintiff's Motion is premised on alleged First Amendment violations, the District

"has the burden of justifying [its] restriction on speech." *Klein v. City of San Clemente*, 584 F.3d

1196, 1201 (9th Cir. 2009). If TST is able to state "a colorable claim" that the District's action

"restricts some form of speech," the burden shifts to the District to "justify its restriction on speech

under whatever level of scrutiny is appropriate (intermediate or strict) given the restriction in

question." *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir.

2020) (quoting *Reilly*, 858 F.3d at 180 n.5). "If the government succeeds in showing

constitutionality, 'then the motion for a preliminary injunction fails because there is no likelihood

of success on the merits.'" *Id.* (quoting *Reilly*, 858 F.3d at 180 n.5). "If the government cannot

establish that the law is constitutional, the challenger must still demonstrate irreparable harm,

though that is generally presumed where the moving party's freedom of speech right is being infringed." *Id.*

The Court notes at the outset that "a school district is under no obligation to open its facilities to expressive activity by outsiders." *Gregoire v. Centennial School Dist.*, 907 F.2d 1366, 1370 (3d Cir. 1990). A public school district, just like a private property owner, "has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* (quoting *Perry Educ. Assn. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 46 (1983)).

However, where, as here, a public school district decides to open up facilities, such as classroom or meeting space, for use by the general public or community groups, it creates either a "designated" or "limited" public forum. *Child Evangelism Fellowship of N.J.*, 233 F. Supp. 2d at 657 ("Elementary schools are not traditional public fora…The more difficult question is whether the school district has established either designated or limited public fora."); *see also* Plaintiff's Motion at pg. 15 of 69 [ECF No. 19] (contending "The District has established a designated public forum for afterschool events and activities."); Defendant's Brief at pg. 16 of 26 [ECF No. 27] (contending the District has "created a limited public forum"). Regardless of whether the District created a designated or limited public forum, the District is not permitted to discriminate against speech on the basis of viewpoint. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). Thus, if the District discriminated against TST's speech on the basis of TST viewpoint, whether the District created a designated or limited public forum is immaterial.

Here, TST states a colorable claim that the District's decision to rescind approval of its application and prohibit the ASSC from using school facilities for the remainder of the current school year restricts TST's speech based on TST's viewpoint, which shifts the burden to the District to justify its restriction on speech. TST credibly alleges the District rescinded approval of

TST's application because of TST's "controversial viewpoint and [the] objectors' reaction to that viewpoint." Plaintiff's Motion at pg. 17 of 69 [ECF No. 19]. TST's application for use of school facilities was approved on February 16, 2023. Vlasaty Affidavit at ¶ 13 [ECF No. 27-1]; Compl. at ¶ 37 [ECF No. 1]. The Superintendent "began receiving phone calls and emails from District parents and community members" expressing concern about the ASSC on February 20, 2023. Defendant's Brief at pg. 9 of 26 [ECF No. 27]. The next day, the District received an anonymous shooting threat referencing the ASSC. Vlasaty Affidavit at ¶ 23 [ECF No. 27-1]. Between February 20, 2023 and February 24, 2023, the District Superintendent received numerous complaints about the approval of TST's application and the shooting threat. Defendant's Index of Exhibits for April 20, 23 hearing, Ex. S-16; S-17 [ECF No. 32]. On February 24, 2023, the District rescinded approval for TST to rent District facilities and prohibited the ASSC from using school facilities, just eight days after initially approving TST's application, and only four days after beginning to receive complaints from the community about TST and the ASSC. Vlasaty Affidavit at ¶ 55 [ECF No. 27-1]. The District's public statement announcing its decision to rescind approval for the ASSC to meet references the shooting threat, as well as the "disruption" and "chaos" experienced by the District and community. Defendant's Index of Exhibits for April 20, 23 hearing, Ex. S-13 [ECF No. 32]. The District subsequently refused to permit TST from re-applying to use school facilities for the remainder of the school year. Compl. at ¶ 90 [ECF No. 1].

Based on the District's quick rescinding of TST's application following widespread community backlash and threats of violence, Plaintiff colorably alleges the District engaged in viewpoint discrimination by rescinding approval of TST's application because of TST's "controversial viewpoint and objectors' reaction to that viewpoint." Plaintiff's Motion at pg. 17 of 69 [ECF No. 19]. This alleged conduct is unconstitutional, as "[t]he censorship of messages

*because* they are controversial is viewpoint discrimination." *Ne. Pa. Freethought Soc'y v. Cty. Of Lackawanna Transit Sys.*, 938 F.3d 424, 439 (3d Cir. 2019) (emphasis in original); *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 475 (3d. Cir. 2015) ("The First Amendment generally does not permit the so-called 'heckler's veto,' i.e., 'allowing the public, with the government's help, to shout down unpopular ideas that stir anger.'") (quoting *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1121 (7th Cir. 2013)). Therefore, under the burden-shifting framework for analyzing a motion for preliminary injunction in First Amendment cases, the burden shifts to the District to justify its restriction on speech under whatever level of scrutiny is appropriate (intermediate or strict) given the restriction in question." *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Reilly*, 858 F.3d at 180 n.5).

ii. **The District Fails to Meet its Burden to Justify its Restriction on TST's Speech**

The District argues its restriction of TST's speech is justified under the First Amendment because the District determined TST violated the District's content-neutral Advertising Restriction contained in Policy 707 by posting social media advertisements on February 20, 2023 and February 23, 2023 that failed to clearly communicate the ASSC was not sponsored by the District. Defendant's Brief at pg. 12 of 26 [ECF No. 27]. The Advertising Restriction requires all organizations not sponsored by the District to "clearly communicate that the activities are not being sponsored by the school district" when "advertising or promoting activities held at school facilities." Board Policy 707 at pg. 4 of 6 [ECF No. 1-4]. The District asserted in its briefing and at oral argument that these violations of the Advertising Restriction contributed to confusion and outrage in the local community, due to the mistaken belief by many that the District was sponsoring the ASSC. The District further suggests the confusion about District sponsorship caused by TST's Advertising Restriction violations may have contributed to the February 21, 2023 shooting threat.

*See* Defendant's Brief at pgs. 12-13 of 26 [ECF No. 27] ("The District later learned that the suspect who allegedly made the threat against the District had learned of the connection between the Club and the District on Facebook, thereby demonstrating the importance of the advertising restriction in Policy 707.").

The first social media post was a Facebook post made on February 20, 2023 by a user identified as "Nikki Romey." *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-8; S-9. [ECF No. 32]. The District contends this post violated the Advertising Restriction because the post was "directed to 'Saucon parents' (i.e., District parents) and stated that Pennsylvania's very first After School Satan Club was 'launching at Saucon' and that participants did not 'have to be students of Saucon Elementary.'" Vlasaty Affidavit at ¶ 47 [ECF No. 27-1]. This, according to the District, "strongly indicated that the Club was being sponsored by the District, in contravention of the advertising restriction in Policy 707." *Id.* Second, the District argues, the Facebook post attached an image of a promotional flyer that differed from the Sample Flyer TST "had produced to the District in discussions with the District about TST's use of District facilities." Defendant's Brief at pg. 12 of 26 [ECF No. 27]. The flyer attached to the Facebook post "identified 'Saucon Valley Middle School' in large font in the center of the flyer" which, according to the District, "indicat[ed] the Club was being sponsored by the District." *Id.* at ¶ 48. Additionally, while the attached flyer contained the Disclaimer stating "This is not an activity of the school or the School District," the District argues the font was "very small," to the point of being "virtually illegible on a computer screen, tablet screen, or smartphone screen." Defendant's Brief at pg. 12 of 26 [ECF No. 27]. The District also argues the February 20, 2023 post by user "Nikki Romey" was ratified by TST, because Ms. Everett, the Campaign Director for ASSC, engaged with the post by clicking the "love" button. *Id.* at pgs. 19-20 of 26.

The second social media post was a Facebook post made on February 23, 2023 by TST's national Facebook page.  *Id.* That post stated "After School Satan Club is coming to Hellertown, PA! Saucon Valley Middle School will host the first ASSC open to both elementary and middle schoolers!" *Id.* at pg. 12 of 26; Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-10. [ECF No. 32]. Although the post included a link to an "online permission slip," the post attached a picture of a flyer completely unlike the Sample Flyer. The flyer attached to this Facebook post did not include the Disclaimer. Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-10. [ECF No. 32]. However, the flyer did state the Club was sponsored by TST, and indicated the Club was being held at "Saucon Valley Middle School." *Id.* In its briefing and at oral argument, the District contended this post also violates the Advertising Restriction because using language such as "Saucon Valley Middle School will *host* the first ASSC," strongly suggests District sponsorship of the ASSC.  Vlasaty Affidavit at ¶¶ 53-54 [ECF No. 27-1] (emphasis added).

The District contends its decision to rescind approval of TST's application to hold ASSC meetings at District facilities "resulted from" these two violations of Policy 707's Advertising Restriction "and the ensuing disruption that violation caused to the District's educational programming." Defendants' Brief at pg. 24 of 26 [ECF No. 27]. The District rejects "TST's viewpoint and content-based discrimination arguments" that "rest on the supposition that the District only took the action it did because of opposition of some in the community to TST –that the District acted in response to a proverbial heckler's veto," arguing the evidence shows the District continued to make plans for TST's use of District facilities even in the face of "an avalanche of opposition to the Club from the community" and "even after receiving the shooting threat," and that it was not until after the District learned of TST's Policy 707 violations that it rescinded approval to use District facilities. *Id.* at pgs. 19-20 of 26.

21

In response, Plaintiff contends the District's Advertising Restriction violation justification is "pretext." Plaintiff's Motion at pg. 2 [ECF No. 27]. The Court agrees. Use of government regulations or statutes as pretext to shut down an organization or business because of the content of its speech or some undesired secondary effects of that speech violates the First Amendment. *See Acara v. Cloud Books, Inc.*, 478 U.S. 697, 708 (1986) (O'Connor, J., concurring); *Abu-Jamal v. Price*, 154 F.3d 128, 136 (3d Cir. 1998) (plaintiff entitled to preliminary injunction preventing Pennsylvania Department of Prisons from enforcing rule prohibiting inmates from carrying on a business or profession as a pretext to violate plaintiff's First Amendment rights).

The District has the burden of demonstrating its decision to rescind approval of TST's application is constitutional. The record before the Court does not support a finding, as the District claims, that "the decision to rescind approval of TST's applications resulted from TST's violation of Policy 707." Defendant's Brief at pg. 19 of 26 [ECF No. 27]. Rather, such decision was unconstitutionally based on TST's controversial viewpoint.

The Court makes this finding based on the following four (4) considerations: The record (1) casts doubt on whether TST even actually violated Policy 707; (2) The record suggests the District enforced Policy 707 against TST in a manner inconsistent with its enforcement of Policy 707 as to other non-sponsored community groups; (3) The record does not support the District's argument that negative public backlash and criticism was caused by a mistaken belief that District sponsored ASSC; and (4) The record strongly indicates the District's decision to rescind TST's approval was motivated by unconstitutional considerations unrelated to Policy 707.

As an initial matter, (1) it is unclear whether TST even violated Policy 707.  The Court gives deference to the District's own assessment as to whether conduct violates its own policies.

That the Court may disagree with the District's determination that TST violated Policy 707 does not, by itself, warrant a finding the District's determination was pretextual. However, because the record indicates TST did not clearly violate Policy 707, it suggests the District's enforcement of Policy 707 was pretextual.

The District claims TST violated Policy 707 based on Facebook posts made on February 20, 2023 and on February 23, 2023. Vlasaty Affidavit at ¶¶ 42-45 [ECF No. 27-1]. However, the District provides no evidence or argument suggesting the author of the February 20, 2023 Facebook post is in any way affiliated with TST or the ASSC. In fact, at oral argument, both parties acknowledged the identity and affiliation of this post's author is unknown. Instead, the District alleges TST is nevertheless responsible for the contents of this post because the Campaign Director for ASSC "loved" the post on Facebook. Defendant's Brief at pg. 19 of 26 [ECF No. 27]. Even if the Court were persuaded – which it is not – by the argument that the social media "likes" of a TST member using their personal Facebook account amounts to TST itself "advertising or promoting activities held at school facilities" such that the social media interaction is subject to Policy 707's Advertising Restriction, it is not even clear this February 20, 2023 Facebook post itself violates the Policy.

The District's chief criticism of the February 20, 2023 Facebook post is that it attaches a flyer which, unlike the Sample Flyer previously shared with the District, references the "Saucon Valley Middle School in large font." Defendant's Brief at pg. 12 of 26 [ECF No. 27]. However, as argued by Plaintiff at oral argument, the attached flyer references the "Saucon Valley Middle School" in order to identify the *location* of the ASSC meeting itself. Indeed, the only material difference between the Sample Flyer and the one attached to the February 20, 2023 Facebook post is that it adds the name "Saucon Valley Middle School" and the school's address. Logically, the

location and address of the club meetings would not have been contained in the Sample Flyer, which was presumably presented to the District before TST obtained approval to use the District's facilities and knew where the ASSC meetings would be held.

Moreover, the flyer attached to the February 20, 2023 Facebook post states the ASSC is "Sponsored by: The Satanic Temple and Reason Alliance," not the District. *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-8; S-9. [ECF No. 32]. Lastly, although the District argues the attached flyer's Disclaimer is too small, the Disclaimer appears to be in the same size font as the Sample Flyer disclaimer. The District never claims it raised any concerns with TST about the Sample Flyer or its Disclaimer. Based on the foregoing, the record does not support a finding the February 20, 2023 post violated Policy 707's Advertising Restriction, nor that the post is even subject to the Restriction.

The second post, a February 23, 2023 Facebook post by TST's national Facebook page, similarly attaches a flyer referencing the location of ASSC at the "Saucon Valley Middle School." Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-10 [ECF No. 32]. Again, the flyer also states ASSC is "Sponsored by: The Satanic Temple and Reason Alliance." *Id.* The flyer does not state ASSC is sponsored by the District. *Id.*

However, the post does state "Saucon Valley Middle School will ***host*** the first ASSC open to both elementary and middle schoolers!" *Id.* (emphasis added). In a vacuum, this statement the Middle School will "host" the ASSC arguably suggests the District is more involved than simply providing meeting space to the ASSC.

Critically, however, it is unclear whether the District even considered this Facebook post when it decided to rescind approval of TST's application. Though the Superintendent testified the

District did consider this post, in its February 24, 2023 letter to TST rescinding approval, the District stated its decision was based on the February 20, 2023 Facebook post alone. Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-14 [ECF No. 32]. The letter makes no mention of or reference to the February 23, 2023 Facebook post from TST's national Facebook page. At best, whether the February 23, 2023 Facebook post violated Policy 707's Advertising Restriction, and whether this post was even a basis for the District's decision, are ambiguous.

(2) Second, the record suggests the District enforced Policy 707 against TST in a manner inconsistent with its enforcement of Policy 707 as to other non-sponsored community groups. TST argues the District "has permitted ongoing to access to the forum by a number of groups whose advertising materials have included *no disclaimer whatsoever*." Plaintiff's Motion at pg. 19 of 69 [ECF No. 19] (emphasis in original). For example, TST argues the Good News Club, a religious community organization not sponsored by the District, advertises with flyers that fail to expressly disclaim sponsorship by the District at all. *Id.* at pg. 14 of 69. Indeed, a Facebook post by the Saucon Community Church advertising the Good News Club attaches a flyer, like TST's flyers, that references the Club's location at "Saucon Valley Middle School," but unlike TST's flyers, does not contain an express disclaimer of District sponsorship. *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-20. [ECF No. 32]. Yet, contrary to the District's determination that TST's advertisements violated Policy 707's Advertisement Restriction, the District claims the Good News Club's advertisements "clearly communicated that the GNC was being sponsored by the Saucon Community Church and Child Evangelism Fellowship." Defendant's Brief at pg. 23 of 26 [ECF No. 27].

The Court fails to see this supposed distinction. Both the Good News Club advertisement and the TST advertisements contain explicit language stating the clubs are sponsored by The

Satanic Temple and Saucon Community Church, respectively. Both clubs' advertisements state the Clubs are "at" or "hosted by" or located at Saucon Valley Middle School. Only TST's flyers contain the explicit Disclaimer stating "[t]his is not an activity of the school or School District." Yet, the District claims it is TST's advertisements, not the Good News Club's, that violate Policy 707's Advertisement Restriction. Moreover, the District fails to identify any clubs other than ASSC that have been refused meeting space for a violating the Advertising Restriction. Accordingly, TST makes a sufficient showing that the District selectively and inconsistently enforced its Advertising Restriction against TST as compared to other similarly situated speakers. The District's proffered distinctions and rationale for this inconsistent enforcement are unpersuasive and fail to satisfy the District's burden of justification. This inconsistent treatment strongly suggests viewpoint discrimination. *See Pittsburgh League of Young Voters Educ. Fund v. Port Auth.*, 653 F.3d 290, 298 (3d Cir. 2011) (holding evidence that Port Authority approved "several noncommercial ads" from other organizations/persons, but declined approval of plaintiffs' ads on the basis they are noncommercial, is "evidence that the District Court could properly consider as strongly suggesting viewpoint discrimination.").

(3) The record does not support the District's argument that the negative public backlash and criticism was caused by a mistaken belief ASSC was District-sponsored. Rather, as the litany of e-mails from parents and community members to the District's Superintendent reveal, the negative community backlash and criticism expressed a frustration with the District's **decision to permit** ASSC meetings, not with a mistaken belief the District **actually sponsored** the ASSC.

A vast majority of the e-mail complaints received by the Superintendent reflect a community-wide understanding that the District's decision was simply to permit the ASSC's use of facilities—not to sponsor the club—as evidenced by the following excerpts: "***I understand that***

*the that the school cannot discriminate over the groups that use the building* but if it impacts the safety and security of the school…"; "I wanted to email you regarding the Satan After School Club which has been *approved by the district*…While *I know they are protected by the first amendment* I am petitioning to *remove all religious clubs*/after school groups. Let the decision be left outside of schools for the parents to introduce what they feel is appropriate to their children when they feel it is appropriate."; "as the superintendent you need to fight back for this school. *Saying yes just because the school isn't allowed to discriminate* against such clubs is not a good enough excuse for me!!"; "Then please shut down all religious after school Clubs if that's what needs to be done to keep Satan out of that building…Change the policy or fight the law."; "You can go on and on about the Supreme Court ruling, but again I say to you that yours is the first school district in all of Pennsylvania that accepted this club. *Others said no and welcomed the lawsuit*. They are at least attempting to do what is right."; "While I understand the first amendment freedom of religion/assembly, *I am puzzled at the school allowing* for a group that claims religious affiliation with 'Satan', not because they believe in Satan or religion for that matter, but use the term to merely be provocative." *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-16, S-17 (emphasis added). [ECF No. 32].

Even if there was any confusion about whether the District sponsored the ASSC, the District made sure to treat ASSC differently by issuing a February 20, 2023 statement expressly disclaiming any sponsorship or endorsement of ASSC, a move the District itself admitted at oral argument it has never previously made with respect to any other after school club. *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-11. [ECF No. 32]. The record simply does not support the District's argument its actions were motivated by a finding of legitimate, widespread community confusion as to whether the District endorsed or sponsored the ASSC.

(4) Lastly, and perhaps most compellingly, the record contains strong evidence the District's decision to rescind approval of TST's application was motivated by unconstitutional considerations unrelated to Policy 707. The District's own Superintendent, who made the decision to rescind TST's approval (Vlasaty Affidavit at ¶ 55), stated in a March 2, 2023 e-mail to a District parent that:

> It is difficult at times when the loudest voices are the most damaging in so many ways. This past week has not been the easiest…We couldn't do what other D[i]stricts have done. Unfortunately, it would have given the Satanic Temple exactly what they wanted, along with more publicity and ammunition and we may have been in a position have to take the Club back after thousands in legal fees, etc. **_We needed to put ourselves in the best position to fight this and hopefully, keep them out_**. I am not sure if we will see them back again, but I believe we are in a better position than other Districts have been. Sometimes true protection isn't noticed or noticeable immediately.

*See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-17. [ECF No. 32] (emphasis added). This statement strongly suggests the District's decision to rescind approval of TST's application was made not to evenhandedly enforce a content-neutral advertising restriction, but to remove TST from the District's facilities due to the controversy surrounding its viewpoint on religion.

Although the District argues TST was not permitted the opportunity to revise its advertising materials and re-apply for this school year because the District was in the process of revising Policy 707, the Superintendent's March 2, 2023 e-mail suggests this rationale is pretextual, and that the District's enforcement of and changes to Policy 707 are motivated by an intent to "keep [TST] out." *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-17. [ECF No. 32]. Additional statements confirm this intent. A February 20, 2023 e-mail from the Superintendent to a community member states:

> **_Unfortunately_**, it is true that it is an organization that exists and in our legal research usually follows school districts which have allowed the Good News Club to use

> facilities, which Saucon has been doing for the last seven years, long before my tenure. ***It also appears that it does what it does for shock value*** and if there is community support, it remains.
>
> From what the organization stated, there was a community member which called them because of the Good News Club. ***This was something that I would never personally support.***

Plaintiff's Exhibit List and Exhibits from April 20, 2023 Hearing [ECF No. 28-3] (emphasis added). Even the District's official statements reveal the decision to rescind approval of TST's application was based on its controversial viewpoint. The District's February 22, 2023 statement advised the Superintendent was "recommending a full review of the Satan Club's use of our facility" due to the February 21, 2023 shooting threat and the "disruption" it caused. *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-12. [ECF No. 32]. The statement does not suggest this review was motivated by concerns TST violated Policy 707.

There is no doubt the District and Superintendent were faced with difficult, time-sensitive decisions. However, the Court's analysis is guided by the law, not practical decision-making considerations or the Court's own personal opinions. The law requires the Court to determine whether the District's decision to rescind approval of TST's application was based on the content of TST's religious viewpoint and the reactions to it. The Court concludes it was.

Because the record does not support the District's argument its decision to rescind approval of TST's application was based on a content and viewpoint neutral enforcement of Policy 707's Advertising Restriction, the District has failed to satisfy its burden to justify the restriction on TST's speech. TST demonstrates a likelihood of success on the merits because the First Amendment prohibits the District from denying TST access to District facilities based on community opposition to TST's speech and its religious viewpoint.

As the Third Circuit has held, "[t]o exclude a group simply because it is controversial or

divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint." *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004).  The District's decision to rescind approval of TST's application based on its controversial viewpoint on religion violates the "bedrock First Amendment principle that speech may not be banned on the ground that it expresses ideas that offend." *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1602 (2022) (quoting *Matal v. Tam*, 582 U.S. 218, 223 (2017)) (internal quotations omitted).

In *Good News Club v. Milford Cent. Sch.*, a public school district similarly opened district rooms and facilities for after school public use. 533 U.S. 98, 102 (2011). There, the local Good News Club sought permission to use the district's school cafeteria for weekly after school meetings where the club would sing songs, hear Bible lessons, and memorize scripture. *Id.* at 103. The school district denied the Good News Club's request because the district prohibited use of District facilities "by any individual or organization for religious purposes." *Id.* The Good News Club, as with TST here, filed an action alleging the school district violated its First Amendment rights and sought "a preliminary injunction to prevent the school from enforcing its religious exclusion policy against the Club and thereby to permit the Club's use of the school facilities." *Id.* at 104.

In analyzing the claim, the Supreme Court assumed the school district operated a limited public forum, but noted that even in a limited public forum, the district's "power to restrict speech…is not without limits" and any restrictions on speech in the forum "must not discriminate against speech on the basis of viewpoint." *Id.* at 106. The Supreme Court held it was "quite clear that" the district "engaged in viewpoint discrimination when it excluded the Club from the afterschool forum." *Id.* at 109. The Good News Club, the Court held, sought "to address a subject otherwise permitted" by the district, which was "the teaching of morals and character." *Id.*

However, because the club sought to address this subject "from a religious standpoint," the district prohibited the Good News Club's speech. *Id.* The Court held this prohibition of the Good News Club's speech based on their "religious viewpoint" as to an otherwise permissible subject matter of "morals and character" constitutes "impermissible viewpoint discrimination" in violation of the First Amendment *Id.* at 112. The Court also rejected the school district's argument that permitting the club to use district facilities would cause students to "misperceive" the club's permission to use district meeting space as "the endorsement of religion," holding this concern is no greater "than the danger that [students] would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum." *Id.* at 118.

The facts here are strikingly similar. TST sought access to the District's public forum for its after school club, the ASSC. Regardless of whether the District's public forum is designated or limited, the District is prohibited from engaging in viewpoint discrimination under the First Amendment. *Id.* at 106; *Child Evangelism Fellowship of N.J.*, 386 F.3d at 526 (holding "even if" school district's forum was "limited" or "closed," school district "still could not engage in viewpoint discrimination."); *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

TST sought access to the District's forum "to provide young people with an alternative to other religious clubs that meet on campus after school" and to express TST's viewpoint of the "seven Satanic virtues" and of "Satan…as a literary figure who represents a metaphorical construct of rejecting tyranny, championing the human mind and spirit, and seeking justice and egalitarianism for all." Complaint at ¶¶ 1, 21, 23 [ECF No. 1]. Accordingly, TST sought to present

a constitutionally protected viewpoint on religion and philosophy. *See United Fed'n of Churches, LLC v. Johnson*, 522 F. Supp. 3d 842, 845 (W.D. Wash. 2021) ("The Satanic Temple…is a religious organization."); *See* Defendant's Index of Exhibits for April 20, 2023 Hearing, Ex. S-11. [ECF No. 32] (acknowledging TST is a religious organization); *Gregoire v. Centennial School Dist.*, 907 F.2d 1366, 1370 (3d Cir. 1990) ("The government may not regulate speech when the specific ideology, opinion or perspective of the speaker is the rationale for the restriction."); *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996 (8th Cir. 2012).

The record indicates the District engaged in viewpoint discrimination by rescinding approval of TST's application based on the controversial nature of TST's viewpoint, and the negative community reaction thereto. *See Child Evangelism Fellowship of N.J., Inc.*, 386 F.3d at 527 ("To exclude a group simply because it is controversial or divisive is viewpoint discrimination."). This action is unconstitutional regardless of whether the District operated a designated or limited public forum. *Id.* at 528 ("Even in the school setting, a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular ***viewpoint*** is not enough to justify the suppression of speech.") (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393, U.S. 503, 509 (1969)) (emphasis added, internal quotations omitted); *Good News Club*, 533 U.S. at 119 (declining to employ "a modified heckler's veto" as basis to bar group's speech in school district's limited public forum); *Munroe*, 805 F.3d at 475 ("The First Amendment generally does not permit the so-called 'heckler's veto,' i.e., 'allowing the public, with the government's help, to shout down unpopular ideas that stir anger.'") (quoting *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1121 (7th Cir. 2013)); *Marshall v. Amuso*, No. 21-4336, 2022 U.S. Dist. LEXIS 62498 at *26 (E.D. Pa. Apr. 4, 2022) ("But the Supreme Court's decision in *Rosenberger* clearly

states that a school's viewpoint discrimination is unconstitutional 'even when the limited public

forum is one of its own creation.'") (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515

U.S. 819, 829 (1995)).

The District's conduct is not justified by the "substantial disruption' test nor the District's

recent modifications to Policy 707. First, the "substantial disruption" test as articulated in *Tinker*

does not apply to instant action. [2] Second, that the District subsequently modified Policy 707 in

---

[2] In *Tinker v. Des Moines*, the Supreme Court held "conduct by the student, in class or out of it, which for any reason…materially disrupts classwork or involves substantial disorder…is of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969). In *Dariano*, the Ninth Circuit held this "substantial disruption" test articulated in *Tinker* permits school officials to "limit" student speech that "materially disrupts classwork or involves substantial disorder" even when the "substantial disruption" is "caused by the reactions of onlookers" and not the speakers themselves. *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 778 (9th Cir. 2014). However, this school-setting exception to the First Amendment's general prohibition against suppressing speech based on negative reactions from listeners (the "heckler's veto") is designed to address only situations where **student** speech causes **internal** disruption and disorder. *See Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 475 (3d. Cir. 2015) (discussing public school setting exception to First Amendment's general prohibition of the "heckler's veto" applies to reactions of students and their parents because "neither parents nor students could be considered as outsiders seeking to 'heckle' an educator into silence – rather they are participants in public education, without whose cooperation public education as a practical matter cannot function.") (quoting *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1121 (7th Cir. 2013)) (internal quotations omitted); *Zamecnik v. Indian Prairie School Dist. # 204*, 636 F.3d 874, 880 (7th Cir. 2011) (holding that *Tinker*'s "substantial disruption test" considers a school district's "legitimate responsibilities, albeit paternalistic in character, **toward the immature captive audience that consists of its students**, including the responsibility of protecting them from being seriously distracted from their studies by offensive speech during school hours.") (emphasis added). Indeed, as the District acknowledges, "*Tinker* and its progeny…have focused on whether a school district may restrict its own students' expression." Defendant's Supplemental Brief at pg. 7 of 8 [ECF No. 36].

In this action, the speech at issue is that of an outside community organization during after school hours, not of a student during school hours. The differences do not end there. Here, Defendants identify the shooting threat made by an anonymous caller causing the District to cancel classes for a day as evidence TST's speech caused "substantial disruption." *Id.* at pg. 4 of 8. However, this disruption was external – not internal. The anonymous caller was not a student or District parent, but rather an individual from North Carolina. *See* Affidavit of Jamie Vlasaty at ¶ 67 [ECF No. 27-1]; Plaintiff's Motion at pg. 8 of 69 [ECF No. 19]. Considering *Tinker* expressly trained the "substantial disruption" test on "conduct by the student," and the Seventh Circuit's determination that the test considers a school district's responsibility "toward the…captive"

the wake of this litigation does not transform the District's decision to rescind its previous approval

of TST's application into constitutionally justified conduct.[3]

In addition to the District's decision to rescind approval of TST's application, TST also

challenges the District's refusal to distribute flyers and parent permission slips for the ASSC to

---

*student* audience, as well as the unwillingness of any other federal court to apply the "substantial disruption" test to non-student speech occurring after school hours based on the hostile reactions of an individual external to the school district, the Court declines to hold the "substantial disruption" test applies here to justify the District's conduct. *Tinker*, 393 U.S. at 513; then *Zamecnik*, 636 F.3d at 880. That the Supreme Court has recently counseled that "the leeway the First Amendment grants to schools in light of their special characteristics is diminished" while considering the "substantial disruption" test further informs this Court's decision. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021).

[3] In its briefing, the District advised it was "currently revising Policy 707" in a "content neutral" manner to, among other changes, limit non-District sponsored individuals and community organizations from using District facilities before 6:00 P.M. Defendant's Brief at pgs. 15-16 of 26 [ECF No. 27]. "Once that process is complete," the District argued, "TST will again be permitted to apply to use District facilities like all other outside groups." *Id.* at pg. 16 of 26. The District subsequently advised this Court on April 26, 2023 that revisions to Policy 707 were in fact enacted. *See* ECF Nos. 33 and 34.

The District's subsequent modifications to Policy 707 do not alter the outcome of the instant Motion. The District approved TST to hold ASSC meetings on District property on the following dates: March 8, 2023, April 12, 2023, and May 10, 2023. Plaintiff's Motion at pg. 8 of 69 [ECF No. 19]. The District rescinded its approval before ASSC could hold any of these meetings. This action by the District, based on the available record, violates the First Amendment. TST is entitled to hold these previously approved meetings under the same terms upon which the parties agreed to when the District approved TST's application on February 16, 2023. Indeed, the entire purpose of a prohibitory preliminary injunction is to return the parties to their "last peaceable, non-contested status." *C.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 439 (E.D. Pa. 2021).

Moreover, consistent with the Court's determination the District's enforcement of Policy 707's prior version against TST was pretextual, the Court also declines to find the District is justified in enforcing a recently amended version of Policy 707 against TST for the purposes of limiting or denying TST's First Amendment right to hold the aforementioned three meetings.

In so holding, the Court makes no determination as to whether enforcement of the revised Policy 707 as applied to any future requests from TST for use of District facilities in future school years, including the 2023-24 school year, is constitutionally permissible, as this issue is not presently before the Court. The issue before the Court is solely whether TST is entitled to preliminary injunctive relief requiring the District to permit TST to hold three meetings of the ASSC during the current 2022-23 school year. The Court holds TST is entitled to such relief, and such ruling is not altered by the District's recent modification of Policy 707.

students in school. *See* Plaintiff's Brief at pgs. 10-13 of 69 [ECF No. 19]. TST alleges that "[a]lthough the District had previously distributed permission slips and flyers from non-school organizations, including the Good News Club and Girls on the Run, it refused to do the same for the ASSC." *Id.* at pg. 10.

As to this allegation, however, the District meets its burden to justify the restriction. Uncontroverted testimony at oral argument and affidavit statements from the District Superintendent advise that while the District had a previous practice of sending home flyers/permission slips with students for non-school sponsored organizations such as the Good News Club, this practice was discontinued by the District as to all non-school sponsored organizations prior to TST ever applying for use of District facilities. *See* Affidavit of Jamie Vlasaty at ¶ 67 [ECF No. 27-1]; *See* Defendant Saucon Valley School District Index of Exhibits for April 20, 2023 Hearing, Ex. S-5. [ECF No. 32]. Accordingly, while TST demonstrates a reasonable probability of success on the merits as to the District's decision to rescind approval of TST's application, TST fails to demonstrate a reasonable probability of success on the merits of its claim the District unconstitutionally refused to send ASSC permission slips/flyers home with students.

### b.  The Remaining Preliminary Injunction Factors Weigh in TST's Favor

#### i.  The District's Alleged First Amendment Violations Demonstrate Irreparable Injury

The Court finds TST demonstrates irreparable injury. Here, TST credibly alleges the District barred TST from exercising its First Amendment rights by excluding it from the District's forum and rescinding approval for the ASSC to meet at District facilities. This actual loss of First Amendment freedoms, even if for a "minimal" period of time, "unquestionably

constitutes irreparable injury." *K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013) (quoting *Elrod v. Burns*, 472 U.S. 347, 373-74 (1976)). *See also Am. Freedom Def. Initiative v. SEPTA*, 92 F. Supp. 3d 314, 330 (E.D. Pa. 2015) (finding plaintiffs sufficiently demonstrated irreparable harm because "Plaintiffs have alleged a real and actual deprivation of their First Amendment rights.").

### c. Granting Preliminary Relief Would Not Result in Even Greater Harm to the District

The Court does not doubt the honorable intentions of the District and its administrators, who were tasked with the unenviable responsibility of responding to hostile community outrage to the District's approval of TST's request, and to a shooting threat. However, having determined, based on the available record at this early stage of litigation, the District's suppression of TST's speech was not constitutionally permissible, the Court declines to hold the District's interest in engaging in an unconstitutional suppression of speech outweighs TST's "exercise of their constitutionally protected rights." *Am. Freedom Def. Initiative*, 92 F. Supp. 3d at 330. *See also Amalgamated Transit Union Local 85 v. Port Auth. Of Allegheny Cnty.*, 39 4th 95, (3d Cir. 2022) ("Neither the Government nor the public generally can claim an interest in the enforcement of an unconstitutional rule.") (quoting *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).

### d. Granting Preliminary Relief is in the Public Interest

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). This general rule holds true here, as "there is a significant public interest in upholding First Amendment principles." *Am. Freedom Def. Initiative*, 92 F. Supp. 3d at 330. *See also Ramsey v. City of Pittsburgh, Pa.*, 764 F. Supp. 2d 728, 735 (W.D. Pa. 2011) ("Courts considering requests for

preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."). Accordingly, the Court determines that granting a preliminary injunction is in the public interest.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, TST's Motion for Temporary Restraining Order And/Or Preliminary Injunction [ECF No. 19] is **GRANTED IN PART** and **DENIED IN PART** as follows:

Plaintiff's Motion to require Defendant to permit the After School Satan Club to meet at the times and on the days previously approved by Defendant is **GRANTED**. Defendant is **ORDERED** to permit the After School Satan Club to meet on the three dates and at the location previously stipulated to by the parties at ECF No. 23. Plaintiff's Motion to require Defendant to distribute After School Satan Club permission slips for students to take home is **DENIED**. An appropriate order follows.

BY THE COURT:

_/s/ John M. Gallagher_____
JOHN M. GALLAGHER
United States District Court Judge